**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

JENNIFER BEAUFORD, DAVID CAFFEY,                            PLAINTIFFS
STEVE COX, ELAINA GRAUER,
RICHARD S. LEVIS, RICHARD NEIDERT,
JILL PATE, RENA SANDOVAL, JR.,
and CHERYL SONGSTER, individually and on
behalf of others similarly situated

v.                                   NO. 4:12CV00139 JLH

ACTIONLINK, LLC                                                  DEFENDANT

**OPINION AND ORDER**

The plaintiffs, current and former employees of ActionLink, LLC, claim that ActionLink failed to pay them overtime as required by the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and they have moved for partial summary judgment on the issue of whether they are exempt employees for FLSA purposes. ActionLink, in turn, has moved for summary judgment, arguing that plaintiffs are exempt from the FLSA's overtime requirements under the outside-sales exemption.[1] ActionLink also contends that a genuine dispute of material fact exists as to whether the plaintiffs are exempt under the administrative exemption. For reasons that will be explained, plaintiffs' motion for partial summary judgment is granted, and ActionLink's motion is denied.

**I.**

ActionLink provides a variety of marketing functions for major home electronics and appliance manufacturers. In 2010, ActionLink contracted with LG Electronics USA to provide a full-service marketing campaign for LG products, known as the LG Slingshot Program. In February of

---

[1] In December of 2011, ActionLink began classifying brand advocates as nonexempt employees for FLSA purposes.

2011, as part of the LG Slingshot Program, ActionLink began employing brand advocates.[2] The plaintiffs in this action are current and former brand advocates. Brand advocates visit retail stores and educate the retail stores' staffs about LG products. A brand advocate's primary duty is to train retail sales associates on the benefits of LG products, with the hope that those sales associates will increase their sales of LG products. *See* Document #45-9 at 2; Document #45-10 at 2; Document #45-11 at 2; Document #45-12 at 2; Document #45-13 at 2; Document #45-14 at 1; Document #45-15 at 2; Document #45-16 at 1; Document #45-17 at 2; Document #45-18 at 2; Document #53-2 at 2. Brand advocates, however, do not sell LG's products to retail stores or sell LG's products from retail stores to consumers. ActionLink's description of the brand-advocate position explains that in addition to educating retail-store staff and driving "sell-thru and recommendation rates," i.e., increases in LG products sold and in retail sales associates' recommendations of those products to consumers, brand advocates maintain display hygiene in stores, resolve in-store disputes, "[f]acilitate in-store activities to optimize sales and visual merchandising," and "[p]rovide in-store support, back-up and direct support, [and] actual-time reporting to management teams." Document #53-4 at 1. While brand advocates spend the majority of their time with retail-store staff, brand advocates sometimes speak directly with consumers and encourage those consumers to buy LG products.

ActionLink seeks to hire brand advocates with prior sales and marketing experiences, yet such experience is not required. Brand advocates go through a five-day training before beginning work. ActionLink gives each brand advocate a list of approximately twenty stores to visit each week.

---

[2] As in the parties' briefs in support of their motions, the term "brand advocate" here refers to ActionLink employees who held the position of ActionLink/LGEUS Brand Advocate Representative Home Electronics/Home Appliances, as well as those with the position of Brand Advocate Representative – Hybrid who performed duties of an ActionLink/LGEUS Merchandising Representative in addition to duties of a Brand Advocate Representative.

ActionLink presents brand advocates with scripts and other promotional materials, such as Power Point presentations, to use during visits to stores. After each visit, brand advocates complete a six-page Call Report in which they answer detailed questions about what they did during their visits. ActionLink evaluates the success of the LG Slingshot Program on "sell-through" – the number of LG products sold at participating retail stores – and evaluates brand advocates' job performances primarily through the same metrics. Brand advocates make up to $42,000 per year. They do not receive incentive-based compensation. The plaintiffs contend that they regularly work more than forty hours per week but are not paid overtime compensation.

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make a showing sufficient to

establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

### III.

**A.     Outside-Sales Exemption**

The FLSA requires employers to compensate employees for hours worked in excess of forty per week at a rate of one and one-half times the employee's regular rate of compensation. 29 U.S.C. § 207(a). This overtime requirement does not apply to "any employee employed . . . in the capacity of outside salesman," "as such terms are defined and delimited from time to time by [Department of Labor] regulations." *Id.* § 213(a)(1); *see Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 183 L. Ed. 2d 153 (2012). Both sides have moved for summary judgment on the issue of whether ActionLink's brand advocates are employed in the capacity of outside salesmen, as defined by the regulations. An exemption from the FLSA's overtime requirements is an affirmative defense for which the employer bears the burden of proof. *See, e.g.*, *Fast v. Applebee's Intern, Inc.*, 638 F.3d 872, 882 (8th Cir. 2011). FLSA exemptions are construed narrowly. *See, e.g.*, *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1186 (8th Cir. 1993).

The regulations define the term "employee employed in the capacity of an outside salesman" in relevant part as "any employee . . . [w]hose primary duty is . . . making sales within the meaning of [29 U.S.C. § 203(k)] . . . and [w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500. The parties do not dispute that ActionLink's brand advocates are customarily and regularly engaged away

from ActionLink's place or places of business, so the relevant question is whether a brand advocate's primary duty is making sales within the meaning of 29 U.S.C. § 203(k).

Twenty-nine U.S.C. § 203(k) states that the term "sale" "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k); *see also* 29 C.F.R. § 541.501(b). A "sale" is not limited to the actual title transfer of the property at issue. *Christopher*, 132 S. Ct. at 2169. The use of the terms "includes," "any," and "other disposition" demonstrates that the definition of "sale" encompasses transactions that might not be considered sales in a technical sense and accommodates various methods of selling commodities. *Id.* at 2170-71. Accordingly, the term "other disposition" includes "those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Id.* at 2171-72.

The FLSA exempts an employee employed *in the capacity* of an outside salesman, 29 U.S.C. § 213(a)(1), which indicates that courts should use a functional, rather than formal, inquiry into determining whether employees fit into the exemption – an inquiry "that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher*, 132 S. Ct. at 2170. Using this functional approach and its interpretation of "other disposition," the Court in *Christopher* found that pharmaceutical sales representatives, also known as "detailers," had "making sales" as their primary duty and therefore were employees employed in the capacity of outside salesmen. *Id.* at 2172. These detailers did not consummate sales in the sense of transferring title; instead, they provided information to physicians about the company's products and sought commitments from the physicians to prescribe those products. *Id.*

Another regulation explains: "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other

hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." 29 C.F.R. § 541.503(a); *see id.* § 541.503(b) ("Promotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work."). The regulation provides an example:

> Another example is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work.

*Id.* § 541.503(c). Similarly, a 1940 report by the Department of Labor's Wage and Hour Division explained that "sales promotion men" "pav[e] the way" for sales by others by, among other duties, "assisting retailers[] and establishing sales displays" and are not outside salesmen for FLSA purposes. Dep't of Labor, Wage and Hour Division, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (1940) [hereinafter 1940 Report]. Sales promotion men are "primarily interested in sales *by* the retailer, not *to* the retailer," and their incidental sales generally are credited to someone else. *Id.* The Court in *Christopher* stated that

> [t]he equivalent of a 'sales promotion man' in the pharmaceutical industry would be an employee who promotes a manufacturer's products to the retail pharmacies that sell the products after purchasing them from a wholesaler or distributor. Detailers, by contrast, obtain nonbinding commitments from the gatekeepers who must prescribe the product if any sale is to take place at all.

*Christopher*, 132 S. Ct. at 2172 n.22.

Brand advocates perform the type of nonexempt promotional work that the regulations, the 1940 Report, and the Supreme Court's decision in *Christopher* explicate. Brand advocates visit retail stores and educate personnel at those stores about LG products, but they do not sell LG products to

6

retailers, nor do they sell LG products to customers at the retail stores. *See, e.g.*, Document #45-9 at 1. A brand advocate's primary duty is to train retail sales associates on the benefits of LG products, with the hope that those sales associates will increase their sales of LG products. *See* Document #53-2 at 2; Document #45-9 at 2; Document #45-10 at 2; Document #45-11 at 2; Document #45-12 at 2; Document #45-13 at 2; Document #45-14 at 1; Document #45-15 at 2; Document #45-16 at 1; Document #45-17 at 2; Document #45-18 at 2. To these ends, ActionLink's description of the brand advocate position explains that brand advocates should drive "sell-thru" of LG products by working with retail associates to "[f]acilitate in-store activities to optimize sales and visual merchandising" and "[s]chedule . . . training of store teams regarding product knowledge and sales skills." Document #45-2 at 1. The position duties revolve around engaging and educating retail associates and sometimes engaging consumers on the benefits of LG products, as well as making LG products stand out in retail stores, to ensure that the sales associates are selling more LG products to consumers. *See id.* at 1-2. These duties are nonexempt promotional work because brand advocates pave the way for sales by others and are interested in sales by the retailer. *See* 1940 Report. They visit retail stores, set up displays, and assist retailers. *See* 29 C.F.R. § 541.503(c); 1940 Report. They perform these functions in conjunction with sales by others; they do not consummate the sales.

ActionLink argues that its brand advocates are functionally equivalent to the detailers in *Christopher* who fell under the outside-sales exemption. In *Christopher*, the Court found that the pharmaceutical industry's "unique regulatory environment" meant that "[o]btaining a nonbinding commitment from a physician to prescribe one of [the pharmaceutical company's] drugs is the most that [detailers] were able to do to ensure the eventual disposition of the products that [the

7

pharmaceutical company] sells." *Christopher*, 132 S. Ct. at 2172. Because patients must have a prescription to purchase the pharmaceutical drugs, obtaining such a commitment from a physician was "tantamount in [the pharmaceutical] industry to a paradigmatic sale of a commodity." *Id.* at 2171-72. The electronics industry is not similar to the pharmaceutical industry in this respect. The law does not prohibit LG, for example, from selling its products directly to retail stores, as it does. *Cf. Campanelli v. Hershey Co.*, 765 F. Supp. 2d 1185, 1194 (N.D. Cal. 2011). Nor is LG prohibited from selling its product directly to consumers, should it choose to do so. Moreover, consumers do not need a prescription or license to purchase LG products, so a retail salesperson is not a "gatekeeper" in a manner that is similar to a physician without whose authorization a patient cannot obtain a prescription drug. In short, a brand advocate's obtaining a promise from a retail salesperson to try to sell LG products is not tantamount to a paradigmatic sale of an appliance or an electronics product.

ActionLink disagrees, arguing that these differences are less consequential because the most that its brand advocates can do in their positions is receive nonbinding commitments from retail associates to sell LG products ahead of other brands. But the Court in *Christopher* rejected this type of comparison:

> Our point is not, as the dissent suggest, that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman. . . . Rather, our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.

*Id.* at 2172 n.23; *see Campanelli*, 765 F. Supp. 2d at 1194 (holding that Hershey's retail sales representatives who primarily were responsible for merchandising Hershey products at retail stores did not fall under the outside-sales exemption because no legal barriers existed to prohibit the sale

pharmaceutical company] sells." *Christopher*, 132 S. Ct. at 2172. Because patients must have a prescription to purchase the pharmaceutical drugs, obtaining such a commitment from a physician was "tantamount in [the pharmaceutical] industry to a paradigmatic sale of a commodity." *Id.* at 2171-72. The electronics industry is not similar to the pharmaceutical industry in this respect. The law does not prohibit LG, for example, from selling its products directly to retail stores, as it does. *Cf. Campanelli v. Hershey Co.*, 765 F. Supp. 2d 1185, 1194 (N.D. Cal. 2011). Nor is LG prohibited from selling its product directly to consumers, should it choose to do so. Moreover, consumers do not need a prescription or license to purchase LG products, so a retail salesperson is not a "gatekeeper" in a manner that is similar to a physician without whose authorization a patient cannot obtain a prescription drug. In short, a brand advocate's obtaining a promise from a retail salesperson to try to sell LG products is not tantamount to a paradigmatic sale of an appliance or an electronics product.

ActionLink disagrees, arguing that these differences are less consequential because the most that its brand advocates can do in their positions is receive nonbinding commitments from retail associates to sell LG products ahead of other brands. But the Court in *Christopher* rejected this type of comparison:

> Our point is not, as the dissent suggest, that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman. . . . Rather, our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.

*Id.* at 2172 n.23; *see Campanelli*, 765 F. Supp. 2d at 1194 (holding that Hershey's retail sales representatives who primarily were responsible for merchandising Hershey products at retail stores did not fall under the outside-sales exemption because no legal barriers existed to prohibit the sale

of Hershey's goods to retailers or to consumers); *see also Contreras v. Lara's Trucks, Inc.*, No. 1:12-CV-85-TWT, 2012 WL 163648, at *2-3 (N.D. Ga. Jan. 14, 2013).

Likewise, brand advocates do not bear the same "external indicia of salesmen" that provided further support for the holding in *Christopher*. Among other external indicia regarding sales experience and minimal supervision, the detailers in *Christopher* received incentive compensation that exceeded twenty-five percent (for petitioner Christopher) and thirty percent (for petitioner Buchanan) of their gross pay. *Cf. Christopher*, 132 S. Ct. at 2164, 2172-73 (detailers received incentive pay based on sales volume or market share in their territories); *Campanelli*, 765 F. Supp. 2d at 1194 (retail sales representatives were not paid commissions to compensate for overtime). While ActionLink seeks to hire persons with sales experience to work as brand advocates, and while it evaluates brand advocates in part on "sell-through performance targets," brand advocates are not rewarded with incentive compensation.[3] Further, the Court in *Christopher* explained that the detailers' salaries – Christopher's annual gross pay was over $72,000 while Buchanan's, the other petitioner, was over $76,000, and the median pay for pharmaceutical representatives nationwide was over $90,000 per year – indicated that detailers were "hardly the kind of employees that the FLSA was intended to protect." *Id.* at 2164 & n.7, 2173. In contrast, ActionLink's brand advocates only make up to $42,000 per year. *See* Document #45-7.

Because making sales is not the primary duty of ActionLink's brand advocates, they are not subject to the outside-sales exemption. No genuine issue of material fact exists on this point, and the plaintiffs' motion for partial summary judgment is granted on this issue.

---

[3] ActionLink suggests that brand advocates have the *potential* for incentive-based bonuses but provides no evidence of any that have been paid to brand advocates or even of how this hypothetical incentive-based system would function.

**B.     Administrative Exemption**

The plaintiffs have also moved for partial summary judgment on ActionLink's contention that brand advocates are subject to the administrative exemption. The FLSA's overtime requirement does not apply to "any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). The regulations define "employee employed in a bona fide administrative capacity" as any employee

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). According to the regulations, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The parties agree that brand advocates satisfy the first element of the definition. The plaintiffs argue that ActionLink cannot prove that brand advocates satisfy the second or third elements.

As to the definition's second element, ActionLink does not argue that brand advocates' primary duty is directly related to the management or general business operations of ActionLink, but rather that their primary duty is directly related to the general business of LG, ActionLink's customer. The regulations explain that to meet the "directly related to the management or general business operations" requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing

production line or selling a product in a retail or service establishment." *Id.* § 541.201(a).[4] Courts have explained that this sets up "a dichotomy between 'administrative work' and 'production work' whereby work that directly generates the product or service that the employer provides is 'production work' falling outside of the administrative exemption." *Smith v. Frac Tech Servs.*, No. 4:09CV00679JLH, 2011 WL 96868, at *7 (E.D. Ark. Jan. 11, 2011) (citing *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004)). Yet the regulations leave a lacuna regarding this dichotomy: while all "work directly related to assisting with the running or servicing of the business" satisfies the definition's second element, "working on a manufacturing production line or selling a product in a retail or service establishment" is only an example of work that does not satisfy the second element. *See Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011).

Further, the regulations explain:

(b) Work directly related to management or business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b). The regulations also explain the role of employers' customers under the definition's second element, separating examples of work directly related to the general business

---

[4] Judge Posner has called this provision "pretty vague," *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011), and another scholar explained that "Judge Posner's observation is a gross understatement," Blake R. Bertagna, *The "Miscellaneous Employee": Exploring the Boundaries of the Fair Labor Standard Act's Administrative Exemption*, 29 Hofstra Lab. & Emp. L.J. 485, 485 (2012).

operations of an employer, *see* 29 C.F.R. § 541.201(b), from those of work directly related to general business operations of the employer's customer:

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

*Id.* § 541.201(c).

ActionLink understandably argues that brand advocates' primary duty is directly related to LG's business operations instead of arguing that their primary duty is directly related to ActionLink's business operations: what ActionLink "produces" is marketing and promotional services for other companies, so brand advocates directly generate ActionLink's product. Because the brand advocates are engaged in promoting LG's sales, however, their primary duty arguably relates to the general business operations of LG. *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9-10 (1st Cir. 1997).

The principal issue relates to the definition's third element: whether brand advocates' "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). The regulations explain:

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

> whether the employee has the authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). Considering these non-exclusive "factors to consider" one at a time, first, brand advocates have no authority to formulate, affect, interpret, or implement management policies or operating practices of LG or ActionLink. They carry out no major assignments in conducting the operations of LG or ActionLink. Individually, there is no evidence that any performs work that affected the business operations of LG or ActionLink to a substantial degree. None has the authority to commit LG or ActionLink in any matters. None has the authority to waive or deviate from LG's or ActionLink's established policies and procedures without prior approval. None has the authority to negotiate and bind LG or ActionLink. None provides consultation or expert advice to LG's or ActionLink's management. None is involved in planning long- or short-term business objectives for LG or ActionLink. None investigates or resolves matters of significance on behalf of LG's or ActionLink's management. And none represents LG or ActionLink in handling complaints, arbitrating disputes, or resolving grievances. Thus, in considering the non-exclusive list of factors in 29 C.F.R. § 541.202(b), it appears plainly that the brand advocates do not exercise discretion and independent judgment in significant matters. *Cf. In re Novartis*, 611 F.3d 141, 155 (2d Cir. 2010) (holding that pharmaceutical sales representatives were not within the administrative exemption based upon the factors in 29 C.F.R. § 541.202(b)), *abrogated on other grounds by Christopher*, 132 S. Ct. 2156; *Kuzinski v. Schering Corp.*, 801 F. Supp. 2d 20, 28 (D. Conn. 2011) (same); *Campanelli*, 765 F. Supp. 2d at 1196 (holding that retail sales representatives who merchandised products in retail stores did not exercise discretion and independent judgment in matters of significance based upon a

review of the factors in 29 C.F.R. § 541.202(b)); *Fiore v. PPG Industries, Inc.*, 169 Wash. App. 325, 342-43, 279 P.3d 972, 982 (2012) (holding that "territory managers" who serviced retail stores did not exercise discretion and independent judgment in matters of significance).

Brand advocates are given a fixed list of stores that they are required to visit and which they cannot decline to visit, unlike the representatives in *Alden* and *Schaefer-LaRose*. At each store that they visit, they are required to complete a Call Report that includes a six-page to-do list. *See* Document #45-5. They are often given scripts to use in presentations to staff at the retail stores they visited. While it is true that the brand advocates have some discretion in developing store-specific strategies, using a monthly budget of $275 for promoting LG sales, deciding how to teach retail sales associates how to recommend LG products to customers, and setting their own schedules, those kinds of decisions do not rise to the level of significance required to meet the third element of the definition of "employee employed in a bona fide administrative capacity." *See Novartis*, 611 F.3d at 157 (sales representatives who were free to decide in what order to visit physicians' offices, how to gain access to those offices, how to allocate promotional budgets, and how to allocate samples still were not exercising discretion or independent judgment in matters of significance); *Campanelli*, 765 F. Supp. 2d at 1196 ("[D]eciding the order of stores to visit, how much time to spend in a store, or which of the sales tools defendant provides to use are not matters of sufficient significance to trigger the administrative exemption").

ActionLink's argument to the contrary is based on *John Alden* and *Schaefer-LaRose*, neither of which is on point. The employees in *John Alden* were marketing representatives for an insurance company. They cultivated a sales force of independent agents and were in constant contact with the agents. *Alden*, 126 F.3d at 3. The representatives typically were college graduates with two to six

years of marketing experience. *Id*. at 4. Their work consisted of making decisions regarding which products to emphasize to a particular agent, relying on their "knowledge of their agent decks and the specific needs of their agents' customers." *Id*. at 4. They also acted "as a conduit between the agent and prospective purchaser, on the one hand, and John Alden's underwriting department, on the other." *Id*. at 5. On average, a first-year marketing representative would generate approximately $1.5 million in sales annually for the company, while a more experienced representative would generate approximately $3 million. *Id*. In addition, the marketing representatives relied on their own knowledge of an agent's business to help tailor proposals for the agent's customers, and they had to be able to anticipate the competing products that the agent's customers might be considering and distinguish John Alden's products from those of the competitors. *Id*. at 13. Thus, there was "clear support in the record for the district court's conclusion that John Alden's marketing representatives exercised discretion and independent judgment in the course of their day-to-day agent contacts." *Id*.

In *Schaefer-LaRose*, the employees were Eli Lilly pharmaceutical sales representatives who made sales calls on physicians seeking their commitment to write prescriptions for patients to use Lilly's products. The sales representatives received extensive training, both substantive and skills-based, which lasted nearly three months. *Schaefer-LaRose*, 679 F.3d at 568. They were trained and tested on diseases, product details, and products manufactured by their competitors. *Id*. "Indeed, Ms. Schaefer-LaRose described herself as a 'scientist,' rather than a salesperson, because she was charged with 'convey[ing] scientific information to physicians about how and why [Lilly's] product is beneficial to patients.'" *Id*. at 568 n.16. Before visiting a particular physician, a sales representative would develop a pre-call plan, which could include reviewing the physician's prescribing practices, patient population, and similar information, to develop a strategy for a

15

conversation with the physician that would induce the physician to prescribe Lilly's pharmaceutical products. *Id*. at 563-64. The sales representatives were expected to tailor Lilly's message to each physician's schedule, preferences, and patient population and to be able to answer questions posed by the physicians, including questions about competing products. *Id*. at 564-65. In concluding that Lilly's pharmaceutical sales representatives exercised independent judgment and discretion with respect to matters of significance, the Seventh Circuit noted:

> The records show that, although most representatives had no medical background, the companies trained them extensively in disease processes, their own assigned products and products manufactured by competitors; indeed they were tested in their substantive knowledge. The level of attention given to substantive education demonstrates that the company viewed these individuals as employees needing a solid understanding of the message that they were delivering if they were to fulfill their roles as the company's representative to the community of practicing physicians. A significant amount of discretion is no doubt required to determine when the physician's inquiry is sufficiently nuanced to require a response from a more knowledgeable individual than the representative himself. The representative who is unable to tailor the conversation to the time and circumstances, or to engage the physician in an intelligent conversation, is understandably not an effective representative to the professional community whose estimation of the company is key to its success.

*Id*. at 581.

The work of ActionLink's brand advocates is not comparable to the work of the marketing representatives in *John Alden* or the sales representatives in *Schaefer-LaRose*. In both *John Alden* and *Schaefer-LaRose*, the representatives were much more sophisticated in their areas of expertise than ActionLink's brand advocates are, as evidenced by difference in education and training required to perform the respective jobs. As noted, most of the marketing representatives in *John Alden* were college graduates with two to six years of marketing experience, and in *Schaefer-LaRose* the employees were given extensive training lasting nearly three months, all of which was necessary because the work entailed the exercise of discretion and independent judgment in matters of

16

significance. In contrast, ActionLink imposed no minimum education requirement for brand advocates and sent them into retail stores after a five-day orientation. *See* Documents #45-2 and #54-1. Although no particular level of education or training is required to meet the administrative exemption, the difference between the education and training required of the representatives of John Alden and Eli Lilly, on the one hand, and ActionLink's brand advocates, on the other, speaks volumes relative to whether the duties of ActionLink's brand advocates are comparable to the duties of the representatives of those companies. The work of brand advocates is much closer to that of the retail sales representatives in *Campanelli* and the territory managers in *Fiore* than to the highly-professionalized work of the marketing representatives and pharmaceutical sales representatives in *John Alden* and *Schaefer-LaRose*.

## CONCLUSION

ActionLink cannot meet its burden to show that plaintiffs are exempt from the FLSA's overtime requirements under the outside-sales exemption or the administrative exemption. ActionLink has not contested the inapplicability of any other exemption. Therefore, plaintiffs are nonexempt employees for FLSA purposes, and plaintiffs' motion for partial summary judgment is granted. Document #43. ActionLink's motion for summary judgment is denied. Document #51.

IT IS SO ORDERED this 27th day of March, 2013.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE