```
1                  IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF ARKANSAS
2                           WESTERN DIVISION

3

   JENNIFER BEAUFORD, et al.,
4  individually and on behalf of
   others similarly situated,
5
                          Plaintiffs,
6
       v.                                  No. 4:12CV00139 JLH
7
   ACTIONLINK, LLC,                        June 1, 2016
8                                          Little Rock, Arkansas
                          Defendant.       8:53 a.m.
9

10                   TRANSCRIPT OF BENCH TRIAL
11           BEFORE THE HONORABLE J. LEON HOLMES,
                  UNITED STATES DISTRICT JUDGE
12

13

   APPEARANCES:
14

   On Behalf of the Plaintiffs:
15
       MR. TIMOTHY A. STEADMAN, Attorney at Law
16     MR. JERRY GARNER, Attorney at Law
         Holleman & Associates, P.A.
17       1008 West 2nd Street
         Little Rock, Arkansas  72201
18

19
   On Behalf of the Defendant:
20
       MR. JOSEPH R. FALASCO, Attorney at Law
21     MS. AMBER DAVIS-TANNER, Attorney at Law
         Quattlebaum, Grooms & Tull, PLLC
22       111 Center Street, Suite 1900
         Little Rock, Arkansas  72201
23

24
       Proceedings reported by machine stenography and displayed
25 in realtime; transcript prepared utilizing computer-aided
   transcription.
```

**I N D E X**

DEFENDANT'S OPENING STATEMENT.............................. 4

PLAINTIFFS' OPENING STATEMENT............................. 7

| WITNESSES FOR THE DEFENDANT: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DAVID GRIES | 11 | 23 | 34 | |
| DELBERT H. TANNER, JR. | 35 | 67 | 79 | |

**EXHIBITS:**                                          **RECEIVED**

Plaintiffs' Exhibits 1 through 5.......................... 10

Defendant's Exhibits 1 through 4.......................... 10

Plaintiffs' Exhibit 6.................................... 79

P R O C E E D I N G S

1  THE COURT:  Everyone, be seated.

2  We're here this morning for a bench trial in the case of

3  Jennifer Beauford and others against ActionLink, LLC, Case No.

4  4:12CV139.

5  Are the plaintiffs ready?

6  MR. STEADMAN:  Yes, Your Honor.

7  THE COURT:  Is the defendant ready?

8  MS. DAVIS-TANNER:  Yes, Your Honor.

9  THE COURT:  We spoke briefly, informally, before

10  opening court and I mentioned that, as I had expected, I

11  received a message from Mr. Steadman that the plaintiffs were,

12  for strategic reasons, withdrawing their objection to the motion

13  for partial summary judgment that had been filed by ActionLink.

14  And I had asked that the parties enter into a stipulation about

15  that, which they did, but not quite.  There's some disagreement

16  about what the withdrawal of that opposition meant, or means.

17  And for purposes of going forward here today, I wanted to

18  confirm or find out whether or not there would be any evidence

19  put on with regard to the amount of unpaid overtime.

20  And I understand, Mr. Steadman, that you all don't intend

21  to go forward and put on any proof about that.  So the only

22  issue that we're going to try is the good-faith defense and

23  liquidated damages.  Is that correct?

24  MR. STEADMAN:  That's correct, Your Honor.

1          THE COURT:  Okay.  And then that means ActionLink will

2    have the burden on that issue, and I'll let you go first.  If

3    you all want to make an opening statement, you may.

4          MS. DAVIS-TANNER:  Thank you.

5      Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MS. DAVIS-TANNER:  The only issue before this Court

8    right now is whether ActionLink acted in good faith when it

9    classified the brand advocates as exempt under the Fair Labor

10   Standards Act.

11      Brand advocates are ActionLink employees that go into

12   retail stores, such as Best Buy, to drive the sales of LG

13   electronics.  ActionLink classified these employees as exempt,

14   and ActionLink will prove that this decision was both

15   subjectively and objectively reasonable.

16      Today, Del Tanner will testify, he's ActionLink's COO, and

17   David Gries, ActionLink's account and analytics manager, will

18   also testify.

19      We approached the evidence of good faith in how the

20   decision was actually made.  At first, ActionLink wasn't sure

21   how to classify the brand advocates, and so a team was assembled

22   and the employees began researching.  Mr. Gries personally

23   looked at and distributed information from the Department of

24   Labor website and he obtained information from ActionLink's HR

25   management company.  The executives and other high-level

1    employees discussed all of this information, over the course of

2    a period of time, about proper classification, and these

3    discussions culminated in a roundtable meeting in which

4    Mr. Tanner made the final classification decision.

5         At that meeting, the team discussed the fact that it was

6    industry practice to classify brand advocates as exempt, the

7    fact that brand advocates work away from ActionLink's primary

8    place of business, they work in the retail stores and on the

9    road, and the fact that brand advocates had many similarities to

10   pharmaceutical reps.

11        Now, this Court and the Eighth Circuit have already held

12   that ActionLink unintentionally misclassified the brand

13   advocates, and we're certainly not here to reargue that issue.

14   However, the witnesses will discuss some of the job duties of

15   brand advocates because those job duties were important

16   considerations when the classification decision was actually

17   being made.  The job duties that they considered relate directly

18   to the good-faith defense and the affirmative steps that

19   ActionLink took when classifying the brand advocates.

20        Some of the similarities between the pharmaceutical reps

21   and brand advocates that ActionLink considered were that both

22   types of employees worked as representatives getting commitments

23   for future sales; they were evaluated by very similar measures;

24   they controlled their visits and sales methods; they had a

25   discretionary business development budget; and their ultimate

1    goal was to increase sales even when the final sale was actually

2    consummated by somebody else.  ActionLink took affirmative

3    steps, researching and analyzing information collected.

4    ActionLink relied on all that information when it decided to

5    classify the brand advocates as exempt.  The classification was

6    also objectively reasonable because ActionLink took reasonable

7    steps to determine the proper classification, and courts all

8    over the country were holding that pharmaceutical reps were

9    exempt, and it was objectively reasonable for ActionLink to draw

10   similarities between the brand advocates and the pharmaceutical

11   reps at that time.

12         Next, we see evidence of good faith in the way that

13   ActionLink cooperated with the Department of Labor.  You'll hear

14   that ActionLink was fully compliant with the Department of

15   Labor's investigation.  Even though the Department of Labor

16   seemed on the fence about the classification of brand advocates

17   initially, ActionLink provided every document, every

18   spreadsheet, and every piece of information that the DOL

19   requested.  When the DOL said that ActionLink had

20   unintentionally misclassified the brand advocates, ActionLink

21   worked quickly to remedy its good-faith mistake.  ActionLink

22   paid the brand advocates quickly, oftentimes even more than the

23   Department of Labor requested, and ActionLink complied very

24   quickly with the Department of Labor's recommendations, with all

25   of them, by reclassifying the brand advocates and instituting

1    new timekeeping procedures.

2        By the end of the day, the Court will have heard evidence

3    that ActionLink worked hard to get it right, ActionLink treated

4    its employees fairly and in good faith when it classified the

5    brand advocates as exempt.  This Court should rule that

6    ActionLink acted in good faith and deny the plaintiffs' request

7    for liquidated damages.

8            THE COURT:  Thank you, Ms. Davis-Tanner.

9        Mr. Steadman.

10           MR. STEADMAN:  Thank you, Your Honor.

11       I plan to be brief because this issue is so narrow in facts

12   and Ms. Tanner covered much of what I had to say about what the

13   brand advocates did.

14       ActionLink classified these brand advocates as exempt from

15   the FLSA's overtime requirement, and after the Department of

16   Labor launched a limited investigation, ActionLink agreed to

17   reclassify them as nonexempt employees.  This Court found that

18   brand advocates were not exempt.  ActionLink cited two

19   exemptions before this Court, both the outside sales and the

20   administrative exemption, and this Court and the Eighth Circuit

21   rejected both of those arguments.  The reason is simple.  The

22   FLSA's regulation expressly states, "Promotional activities

23   designed to stimulate sales that will be made by someone else

24   are not exempt outside sales work."  Similarly, on the

25   administrative exemption, the Court found that, "... it appears

1   plainly that the brand advocates do not exercise discretion and

2   independent judgment in significant matters."  The only issue is

3   whether ActionLink can avoid liquidated damages.

4        As the Court is aware, liquidated damages are mandatory

5   unless ActionLink proves its statutory defense.  They have to

6   show to the satisfaction of the Court that the act or omission

7   giving rise to such action was in good faith and that they had

8   reasonable grounds for believing the act or omission was not in

9   violation of the Fair Labor Standards Act as amended.  If the

10  Court makes that finding, it can, in its discretion, award no

11  liquidated damages or award any amount thereof up to an equal

12  amount as liquidated damages.

13       The employer's burden on this is a difficult one, with

14  double damages being the norm and single damages being the

15  exception.  And based on what was said in opening, ActionLink

16  can't meet its burden.

17       First, the work of the brand advocates was clearly not

18  exempt.  We've heard the evidence will show that they considered

19  the outside sales exemption.  The regulation expressly discusses

20  the exact type of work that the brand advocates are doing.

21  Brand advocates are not similar to pharmaceutical sales reps.

22  As this Court and the Eighth Circuit recognized, pharmaceutical

23  reps operate under a unique regulatory framework that does not

24  allow them to sell products to you or I.  The only person that

25  serves that gatekeeping function is the doctor.

1       Second, it's not relevant that ActionLink cooperated with

2   the DOL after it got caught.  The issue is whether they had a

3   good faith and reasonable belief at the time they were

4   investigated.

5       One aside that I do want to mention, I heard several times

6   during the opening that the Court and the Eighth Circuit found

7   that the decision was unintentional, and I don't believe that

8   that's correct.  The issue of willfulness was never an issue

9   because this case was brought within two years.  Based on what

10  was said in opening, it sounds like ActionLink made an

11  intentional decision to classify these brand advocates as

12  exempt.  They might have thought they were following the law,

13  but there is no evidence that anyone has found that that was

14  unintentional, accidental, in good faith yet.  In fact, based on

15  the DOL report, which I believe will be introduced in evidence,

16  the statement that ActionLink unintentionally did this was made

17  by Keith Allen, an ActionLink employee.  But it's not relevant

18  that ActionLink cooperated with the DOL after it got caught.

19      And plaintiffs also plan to question Mr. Gries about the

20  methodology.  To the extent that what happened after the fact is

21  relevant, plaintiffs intend to question Mr. Gries about the

22  activities that were not included in the backpay calculations.

23      And I don't have anything further, Your Honor.

24          THE COURT:  All right.  Both of you have submitted

25  exhibits.  Do we have a stipulation that all the exhibits on

1   both sides can be admitted?

2          MS. DAVIS-TANNER:  Yes, Your Honor.

3          MR. STEADMAN:  Yes, Your Honor.

4          THE COURT:  Let's see.  We're talking about Exhibits 1

5   through 5 for the plaintiff and 1, 2, 3, and 4 for the defense.

6   Is that correct?

7          MS. DAVIS-TANNER:  Yes, Your Honor.

8          MR. STEADMAN:  Yes, Your Honor.

9          THE COURT:  Those are all admitted.

10      (Plaintiffs' Exhibits 1 through 5; Defendant's Exhibits 1

11   through 4 received in evidence.)

12          THE COURT:  Does either side wish to invoke the

13   witness sequestration rule?

14          MR. STEADMAN:  Yes, Your Honor.

15          THE COURT:  All right.  Then witnesses will need to be

16   excluded, other than the corporate representative seated at

17   counsel table.

18      Is he the first witness?

19          MR. FALASCO:  Yes.

20          THE COURT:  Okay.  You can come back in.  You're going

21   to testify first anyway.

22      Call your first.

23          MS. DAVIS-TANNER:  Your Honor, we'd like to call David

24   Gries, please.

25          THE COURT:  All right.  Come forward and be sworn.

1      **DAVID GRIES, DEFENDANT'S WITNESS, DULY SWORN**

2          THE COURT:  You may proceed.

3                      DIRECT EXAMINATION

4  BY MS. DAVIS-TANNER:

5  Q.    Could you, please, state your name for the record?

6  A.    David Gries.

7  Q.    Where do you work, Mr. Gries?

8  A.    ActionLink.

9  Q.    How long have you worked at ActionLink?

10 A.    Almost twelve years.

11 Q.    Where did you work before you worked at ActionLink?

12 A.    A company called S.A. Comunale.

13 Q.    And what did you do there?

14 A.    I was the payroll supervisor.

15 Q.    How long were you at that company?

16 A.    Five years.

17 Q.    What's your position at ActionLink?

18 A.    Account and analytics manager.

19 Q.    How long have you been in that position?

20 A.    Two years.

21 Q.    What were you before you were the account and analytics

22 manager?

23 A.    The payroll manager.

24 Q.    And how long were you in that position?

25 A.    Almost ten years.

1  Q.    Kind of broadly speaking, can you tell the Court what

2  ActionLink does?

3  A.    ActionLink works with other companies that sell consumer

4  electronics, and our job is to go into retail stores and drive

5  their sales.

6  Q.    And does ActionLink work with several different brands to

7  do this?

8  A.    Yes, they do.

9  Q.    Could you name a few of those brands?

10  A.    LG, Sony, Samsung.

11  Q.    Are you familiar with the LG Slingshot Program?

12  A.    Yes.

13  Q.    What was your involvement in the decision regarding how to

14  classify the employees in the LG Slingshot Program?

15  A.    I was a member of the team you spoke of earlier that

16  gathered information from the DOL website, our HR management

17  company, and collected all that so we can make a group decision

18  on the classification.

19  Q.    Were you involved in any discussions about how to classify

20  the brand advocates?

21  A.    I was involved in some discussions, yes.

22  Q.    And were you the payroll manager while that was happening?

23  A.    Yes, I was.

24  Q.    Can you describe a basic overview of how the decision was

25  made?

1    A.    Using that information that we collected, we had multiple

2    conversations within the company and then had one big roundtable

3    where all that information was dispersed to everyone beforehand

4    and we discussed that information to come up to a decision.

5    Q.    Was Del Tanner at that roundtable meeting?

6    A.    Yes, he was.

7    Q.    What was his position in the company at that time?

8    A.    He was, and still is, the COO.

9    Q.    And what other sorts of employees were in the meeting?

10   A.    We had people from HR; the majority were people from HR.

11   We had people from the executive team.  We had people from the

12   LG field team as well.

13   Q.    And what was your role on the team?

14   A.    My role was to gather that information that we used to --

15   from the DOL, the HR management company.

16   Q.    What did you do with that information once it was gathered?

17   A.    Once I gathered it, I emailed it to everybody that would be

18   in that roundtable meeting, including Del Tanner, so everyone

19   could pre -- look it over before we had our discussion.

20   Q.    And was all of the information that you gathered discussed

21   at the meeting?

22   A.    Yes.

23   Q.    Describe generally what happened during the meeting itself.

24   A.    We went over some of the documents.  And when the

25   "pharmaceutical rep" came up, that was kind of our deciding

1  factor of -- some of us were on the fence going into the

2  meeting, and that was the deciding factor of how many of us

3  felt, that the LG brand advocates could be classified as exempt.

4  Q.   In addition to the information you gathered from the DOL

5  website and the HR management company, did you also consider

6  industry practice during that meeting?

7  A.   Yes.  Many people had, in that meeting, had many years of

8  experience in the industry and knew that that was common

9  practice.

10 Q.   When you left the meeting did you think that the brand

11 advocates were properly classified?

12 A.   When I left the meeting?

13 Q.   Yes.

14 A.   At that point I did, yes.

15 Q.   Going into the meeting how did you think they should be

16 classified?

17 A.   I was on the fence.  There's a lot of different legal

18 wording, such as the promotional work that they mentioned

19 before.  But I felt that if you replaced -- in the

20 pharmaceutical rep example, if you replaced pharmaceutical drugs

21 with LG TVs, that described our LG brand advocates' job duties

22 perfectly.

23 Q.   Let's just start focusing a little bit on the Department of

24 Labor investigation.  Okay?

25 A.   Okay.

1  Q.    First, were you aware of an investigation by the Department

2  of Labor?

3  A.    Yes, I was.

4  Q.    And when was that?

5  A.    That would have been around in the fall, around

6  September 2011.

7  Q.    Were you payroll manager at that time as well?

8  A.    Yes, I was.

9  Q.    What was the investigation about?

10  A.    There was a complaint regarding LG merchandising reps, that

11  they were misclassified as exempt.

12  Q.    And did the brand advocate position ever come into question

13  during the investigation?

14  A.    It did.  As we were handing over information to the

15  Department of Labor regarding the LG merchandisers, we also gave

16  them the information on the LG brand advocates because they were

17  also classified the same, as exempt.

18  Q.    What was your initial feeling when you found out the DOL

19  was investigating the brand advocate position?

20  A.    I was surprised that it was in question.

21  Q.    Why?

22  A.    I thought we did our due diligence to come up with an

23  accurate decision to classify them as exempt back at that

24  roundtable discussion.

25  Q.    Who was the primary investigator in this investigation?

1    A.    His name was Stephen Banig.

2    Q.    And did you work directly with Mr. Banig during the

3    investigation?

4    A.    Yes, I did.

5    Q.    Can you describe ActionLink's participation in the

6    investigation?

7    A.    We fully cooperated with anything he requested.

8    Q.    Are you familiar with the Department of Labor's file on the

9    investigation?

10   A.    Yes, I am.

11   Q.    Could you turn to Exhibit 1 in the binder, please?  Is this

12   the file?

13   A.    Yes, it is.

14   Q.    What kind of information did you provide to the Department

15   of Labor?

16   A.    I provided the brand advocate job descriptions.  I provided

17   information on hours worked and information on what they were

18   paid.

19   Q.    Did you personally compile that information?

20   A.    I compiled spreadsheets of the hours worked and what was

21   paid, yes.

22   Q.    If you could turn to page 941 of Exhibit 1.  What is this?

23   A.    These are the spreadsheets that we sent over to the

24   Department of Labor with the calculations of the backpay.

25   Q.    About how many pages of spreadsheets are there in this

1   file?

2   A.    Roughly, 120.

3   Q.    Was there anything that Mr. Banig ever asked you for that

4   you did not provide?

5   A.    No.  We provided everything that was requested.

6   Q.    What did you learn from the investigation?

7   A.    We learned -- well, the DOL determined that we

8   unintentionally classified the brand advocates as exempt.

9   Q.    And did Mr. Banig make that determination immediately when

10  he first started looking at the brand advocates?

11  A.    No, they debated it for close to a month before they came

12  back with that decision.

13  Q.    Now, did the Department of Labor determine how much it

14  thought you owed the brand advocates for back overtime?

15  A.    They did.

16  Q.    What documents did you give to the DOL that it could

17  consider in making that determination?

18  A.    I gave them time information from Natural Insight.

19  Q.    Can you kind of describe what Natural Insight is?

20  A.    Natural Insight is our work-force management system.  It's

21  where brand advocates or all our field employees go in and they

22  report their -- besides questions about their visit -- their

23  time they were in, they got to a store, and when they left that

24  store.

25  Q.    Now, what did ActionLink as a company do with regard to the

1    amount of back overtime to be paid to the brand advocates?

2    A.    I did my own investigation as far as the calculations, as

3    well, for what was --

4    Q.    And what did you look at in that investigation?

5    A.    I used the Natural Insight information.  That's the most

6    accurate data we have for timekeeping.

7    Q.    And why do you think it's the most accurate data you had?

8    A.    Because the employees, the brand advocates are

9    self-reporting their times in each store.

10   Q.    How did you -- what was your actual mechanism for using the

11   Natural Insight's data?

12   A.    What I did was, for every day any of the brand advocates

13   worked, I collected the time that they got to their first store,

14   for example, say 9:00 a.m., and then the time they left their

15   last store for the day, let's say 6:00 p.m., and then I

16   considered that entire time frame as their workday.  So that

17   would have been a nine-hour day in that example.

18   Q.    Now, were the brand advocates working during that entire

19   time?

20   A.    No, they wouldn't have been working that entire time.

21   Q.    What other kinds of things would they be doing?

22   A.    Their lunch and dinner breaks would have been in that time

23   frame, any other breaks -- any personal errands.  I mean, for

24   example, in that one I gave you, they might have went to the

25   store from 9:00 a.m. to 10:00 a.m. and then went to another

1    store from 5:00 p.m. to 6:00 p.m.  That's only two stores and

2    only two hours' work, but they got full credit for the nine

3    hours.

4    Q.    Did the brand advocates ever do any work that may not have

5    been included between the time they went to the first store and

6    left their last store?

7    A.    Sometimes they could have.

8    Q.    What kind of work would they be doing?

9    A.    They would be entering call reports into Natural Insight,

10   taking calls, answering email, paperwork.

11   Q.    How often did they do that kind of work?

12   A.    It was minimal.

13   Q.    Why did you decide it was fair to rely on the Natural

14   Insight's data even though they may have been doing some work

15   after they left the last store?

16   A.    We felt that the time that was included in that time frame

17   we determined, with their breaks, lunch breaks, and any off

18   time, would have been equivalent or even greater than the amount

19   of time they did work outside of that time frame.

20   Q.    Did you talk about this methodology with the Department of

21   Labor?

22   A.    I did.

23   Q.    And was there any kind of concern that it was not going to

24   be properly compensating the brand advocates?

25   A.    No.  Stephen Banig at the Department of Labor agreed that

1   it was a good calculation.

2   Q.   When you looked at the Natural Insight's data, did the

3   brand advocates always work 40 hours per week?

4   A.   No, there were oftentimes they were under the 40 hours.

5   Q.   What else did you have to consider when you were making the

6   calculations?

7   A.   The state that they lived in.

8   Q.   And what effect did that have on the payments that the

9   brand advocates eventually received?

10  A.   Our HR management company informed us that some states do

11  not recognize salary nonexempt status, and California would be

12  the one that came into play here.  For those states, I

13  calculated them as hourly.  I used the same methodology for that

14  nine-hour example, when I used that to calculate their actual

15  time and a half overtime, or if they had state overtime, which

16  is over eight hours in a day.

17  Q.   Okay.  And how did those payments relate to what the

18  Department of Labor had calculated?

19  A.   It made many of the payments bigger.

20  Q.   Did you talk to Mr. Banig near the end of his

21  investigation?

22  A.   Yes.

23  Q.   What did you tell him?

24  A.   I told him that we agreed to come into compliance and

25  change them over to nonexempt, that we would collect accurate

1    time sheet information on an actual time sheet instead of

2    relying on NI, and that we would get their backpay calculated

3    and paid quickly.

4    Q.    And did you actually pay that back overtime?

5    A.    Yes.

6    Q.    You said earlier that sometimes your calculations were

7    higher than the Department of Labor's calculations.  If there

8    was a discrepancy like that, which one would you use?

9    A.    Well, they would get paid the higher amount.

10   Q.    What did the Department of Labor indicate about that

11   decision?

12   A.    Stephen Banig said that it was approved.

13   Q.    Can you turn to Exhibit 2 in your binder, please?

14   A.    Okay.

15   Q.    What is Exhibit 2?

16   A.    Exhibit 2 is an email conversation between me and

17   Mr. Banig.

18   Q.    And is this the email conversation where Mr. Banig approved

19   your calculation?

20   A.    Yes.  On page 2, towards the bottom, he says, "I reviewed

21   the calculations and they appear to be fine."

22   Q.    Now, how quickly did you pay the brand advocates their back

23   overtime?

24   A.    We paid them on December 30, 2011, which was just shortly

25   after the investigation concluded.

1   Q.    Okay.  Can you turn to Exhibit 3, please?

2   A.    Yes.

3   Q.    Are these the checks that you paid to the brand advocates?

4   A.    Yes, they are.

5   Q.    And this shows it was made on December 30.  Right?

6   A.    Correct.

7   Q.    What else did you do with regard to the brand advocates'

8   classification when you got information that they might be

9   misclassified?

10  A.    We reclassified them immediately.  We started collecting

11  their time on time sheets and paying any overtime if they worked

12  over 40 hours, and we got them their backpay in a quick manner.

13  Q.    Why did you decide to go ahead and reclassify those

14  workers?

15  A.    We wanted to be compliant with the law.

16  Q.    How often did brand advocates work overtime once you

17  reclassified them and made sure all work was done on the clock?

18  A.    It was considerably minimal the amount of times people

19  reported working over 40 hours.

20  Q.    At the very end of the investigation, what did the

21  Department of Labor do?

22  A.    They issued a Form WH-56.

23  Q.    And is that Form WH-56 included in the Department of Labor

24  file?

25  A.    Yes, it is.

1    Q.    Is that starting on page 929?

2    A.    Yes.  I'm looking at the screen.  Yes, it is.

3    Q.    How do the payments in the WH-56 compare to the payments

4    for back overtime that you had sent to the brand advocates?

5    A.    The ones in the WH-56 were either exactly the same as our

6    payment or lower.  Our payments were higher.

7    Q.    And just to wrap up real quick, how does ActionLink

8    endeavor to treat its employees?

9    A.    We try to treat everybody fairly.

10   Q.    Do you think you did that in this case?

11   A.    I do.  As soon as we found out we unintentionally

12   misclassified them, we classified them correctly, quickly, and

13   we got them their backpay quickly, and we are now paying them

14   overtime for any hours worked over 40.

15   Q.    Did you think that you were treating them fairly when you

16   made the classification decision?

17   A.    When we made the classification, we did.

18   Q.    That's all we have.  Thank you.

19              MR. STEADMAN:  Your Honor, may I approach the witness

20   with exhibits?

21              THE COURT:  You may.

22                           CROSS-EXAMINATION

23   BY MR. STEADMAN:

24   Q.    Good morning, Mr. Gries.

25   A.    Good morning.

1  Q.   You covered a little of your background, but I didn't hear

2  you talk about your education.  Did you go to college?

3  A.   I did go to college, the University of Akron.

4  Q.   Do you have a degree from the University of Akron?

5  A.   I did not finish my degree, no.

6  Q.   What was your course of study at the University of Akron?

7  A.   Business management.

8  Q.   How long did you attend the University of Akron?

9  A.   Three years.  I also went to Ohio State for a short period

10  as well.

11  Q.   What did you study at Ohio State?

12  A.   It was in the business fields, general studies.

13  Q.   How many credits do you need to obtain a degree?

14  A.   I know I'm classified as a junior, but I don't know exactly

15  how many credits are left.

16  Q.   I want to talk about the initial decision to classify.

17  What was the name of the HR company?

18  A.   Oasis Outsourcing.

19  Q.   Do you know who owns Oasis Outsourcing?

20  A.   No, I do not.

21  Q.   You testified that you gathered some materials, you

22  mentioned going to the DOL website.  Specifically, what other

23  materials did you gather?

24  A.   Well, we gathered on the DOL website anything that had to

25  do with the exemption tests.  I was looking for information on

1   the outside sales exemption, whether it was documents that I

2   found or links, I was sending those on to the team.

3   Q.   How many people were involved in this?

4   A.   There's roughly six people, six or seven people on the

5   team.

6   Q.   Were all six or seven of those people ActionLink employees?

7   A.   Yes.

8   Q.   Did you talk to a lawyer?

9   A.   We did gather information from Oasis's lawyer.  He was --

10  well, I don't know that that was -- I take that back.  I don't

11  know that that was at the decision-making time or that was at

12  the investigation time.  I know we talked to him during the DOL

13  investigation.

14  Q.   Is that Timothy Tack?

15  A.   Yes.

16  Q.   But you didn't talk to Mr. Tack or any other attorney when

17  making this decision?

18  A.   I personally did not.

19  Q.   Do you know if anybody on the roundtable did?

20  A.   I do not know.

21  Q.   You testified earlier that you thought the sales reps were

22  just like pharmaceutical reps.

23  A.   Correct.

24  Q.   Can LG sell its products directly to consumers?

25  A.   You mean through us or just in general?

1    Q.    In general.

2    A.    I believe they can, yes.  Yes.

3    Q.    Do I need a prescription to buy an LG TV?

4    A.    No.

5    Q.    Do I have to get permission from a governmental agency to

6    sell LG TVs?

7    A.    No.

8    Q.    You testified that you did read part of the regulation or

9    fact sheet that said, "Promotional work that is incidental to

10   sales made, or to be made, by someone else is not exempt outside

11   sales work."  Correct?

12   A.    I do remember reading that, yes.

13   Q.    You understood that at the time?

14   A.    On the fence.  I believe there was other language in there

15   that said it may or may not be.

16   Q.    If it's performed incidental to and in conjunction with an

17   employee's own outside sales or solicitations, that's exempt

18   work, but you understand that if somebody else is making the

19   sale and it's promotional work, then it's not outside sales

20   work?

21   A.    That was the part that we were unclear on.

22   Q.    I do want to go to the DOL investigation.  It's my

23   understanding that this program was conceived sometime in late

24   2010.  Is that correct?

25   A.    I don't know if that's when we won the contract or not.

1   Q.    Okay.  When were these roundtable meetings held?

2   A.    If they weren't in the early part of 2011, then it may have

3   been late 2010.

4   Q.    Right after you won the contract?

5   A.    It was maybe not right after, but before we started the

6   program.

7   Q.    And the program started February 2011?

8   A.    Correct.

9   Q.    When did the DOL begin its investigation?

10  A.    It was -- I believe it was September of 2011.

11  Q.    I believe you testified you cooperated with the DOL.

12  A.    Correct.

13  Q.    Did ActionLink maintain its position with the DOL that

14  these employees were exempt under the outside sales requirement?

15  A.    We did believe that we were still accurate when it was

16  being investigated.

17  Q.    And at what point did you agree to reclassify these

18  employees and make the backpay?

19  A.    I believe it was December when the -- when they determined

20  that they were misclassified and we agreed to reclassify them.

21  Q.    Okay.  And if you'll turn to what was Defense Exhibit 1.

22  The number in the right-hand corner is ActionLink 925.

23  A.    Okay.

24  Q.    Do you see that?

25  A.    Yes.

1  Q.   About halfway down, it talks about a conference on 12-9 of

2  2011.

3  A.   Uh-huh.

4  Q.   Were you involved in that conference?

5  A.   Yes, I was.

6  Q.   At the conclusion of that meeting, according to this

7  report, ActionLink asked for a week to discuss the firm's

8  position.  Correct?

9  A.   Correct.

10 Q.   Okay.  And then on 12-23, you advised Stephen Banig that

11 ActionLink had agreed to come into compliance.  Correct?

12 A.   Correct.

13 Q.   If you'll flip to the second page of this, page 2.  And

14 these are conclusions and recommendations.  And this is signed

15 January 30 of 2012.  Correct?

16 A.   December -- I can't read it.

17 Q.   Looks like 1-30 to me.

18 A.   Okay.

19 Q.   And you understood that the DOL found that ActionLink

20 misclassified brand advocates and merchandising reps as outside

21 sales, and, number two, it failed to keep records of hours

22 worked.  Correct?

23 A.   Correct.

24 Q.   But this finding was made that ActionLink agreed to come

25 into compliance on December 23 of 2011.  Correct?

1    A.    Correct.

2    Q.    If you can flip to what is marked as Plaintiffs' Exhibit

3    No. 3.

4    A.    Mine goes from 1, 2, to 4.  I don't have a number 3.

5          MR. STEADMAN:  May I approach?

6          THE COURT:  You may.

7          THE WITNESS:  1, 2, 4.

8    BY MR. STEADMAN:

9    Q.    Are you familiar with this letter?

10   A.    I have seen this, yes.

11   Q.    Did you play any role in writing this letter?

12   A.    I did not.  I might have provided some facts, but I did not

13   help word it.

14   Q.    This letter was sent to brand advocates on or about

15   December 26?

16   A.    Okay.

17   Q.    Is that correct?

18   A.    Yes.

19   Q.    And the letter says that brand advocates were reclassified

20   on December 26.  Correct?

21   A.    Correct.

22   Q.    Is that your understanding?

23   A.    That is accurate.

24   Q.    Now, with regard to the calculations that Mr. Banig

25   approved, those calculations were made in November.  Correct?

1   A.    Correct.  His investigation ended in November.

2   Q.    And ActionLink continued classifying employees as exempt

3   from November until December 26.  Correct?

4   A.    Correct.

5   Q.    Then the email, which I believe is Exhibit 2, your

6   communications with Mr. Banig, this happened before ActionLink

7   had agreed to come into compliance.  Correct?

8   A.    Number 2, yes, that would have.

9   Q.    And this correspondence chain, your correspondence to

10  Mr. Banig is on November 23, and going back, Mr. Banig emailed

11  to you on November 23, and then the reply is on November 25.

12  Correct?

13  A.    Correct.

14  Q.    Okay.  And is it your recollection that that was

15  Thanksgiving week?

16  A.    I don't recall that, but it would have been around that

17  time, sure.

18  Q.    Okay.  And if you'll look at the very last email from

19  Mr. Banig to you, the last says, "I hope you're at home today

20  and don't get this until Monday," with a smiley face?

21  A.    Oh, yes.

22  Q.    Does that refresh your recollection?

23  A.    Yeah.  That would have been he was hoping I wasn't working

24  over the holiday, yes.

25  Q.    And the WH-56 that was sent to ActionLink, that wasn't sent

Gries - Cross

1    until January or February of 2012.  Correct?

2    A.    Correct.

3    Q.    Now, putting together the damage -- the calculation of back

4    overtime, you testified you did some research.  Correct?

5    A.    Uh-huh.

6    Q.    In your research did you learn that travel time from job

7    site to job site is compensable time?

8    A.    Correct.

9    Q.    Brand advocates, were they required to take things to the

10   store?

11   A.    I believe so, but I don't know.

12   Q.    They maintain tools at their home?

13   A.    I believe so, yes.

14   Q.    Part of their job was maintaining hygiene displays?

15   A.    Yes.

16   Q.    Other training materials that they had to give?

17   A.    I believe so.

18   Q.    Did your research reveal whether or not travel under those

19   circumstances, when you have to gather materials to make sure

20   you have them on the first job site, whether that turns travel

21   from home to the first job site into compensable time?

22   A.    We did not investigate that, no.

23   Q.    Okay.  Did you investigate the requirement for a bona fide

24   meal period under the Fair Labor Standards Act?

25   A.    Yes.

1  Q.    And what is your understanding of that requirement?

2  A.    That we have to -- well, I know some states have their own

3  jurisdiction.  But you have to allow them time completely off

4  from work for a 30-minute break, I believe.

5  Q.    Okay.  But you understood that if a brand advocate traveled

6  from Sears to a Best Buy, that that travel time would be

7  compensable time.  Correct?

8  A.    Correct.

9  Q.    And you testified that brand advocates had to do call

10 reports?

11 A.    Uh-huh.

12 Q.    I think you called it "minimally."  But they had to do a

13 call report for every store.  Correct?

14 A.    Correct.

15 Q.    That's a six-page report.  Correct?

16 A.    I believe it varied.

17 Q.    All right.  What's the -- what did it vary between?

18 A.    I don't actually have a number that it verified, but the

19 research that I did was going to the field managers and

20 discussing our methodology of, you know, not deducting lunches

21 or dinners from their time and asking if that would have

22 significantly covered any time outside of their -- outside of

23 these hours that we used, and they agreed that it would have

24 been fair to assume that.

25 Q.    Brand advocates also had to do conference calls on at least

1  a weekly basis.  Is that correct?

2  A.   I don't know if it was weekly, but they did have to do

3  conference calls.

4  Q.   Did brand advocates have to go through additional training

5  on LG products?

6  A.   I believe so, yes, but I believe that would have been --

7  could have been done during the day, during the time frame that

8  we calculated.

9         MR. STEADMAN:  If I may have just one moment, Your

10 Honor?

11        THE COURT:  You may.

12     (Mr. Steadman confers with Mr. Garner.)

13 BY MR. STEADMAN:

14 Q.   Going back to the roundtable.  Do you remember what

15 documents you received from the HR company?

16 A.   There was a document that showed the different exemptions

17 and the tests, and that's also the one that referred to the

18 pharmaceutical rep.

19 Q.   Just to be clear, during that initial phase, the exemption

20 that ActionLink was relying on was the outside sales.  Correct?

21 A.   That's right.

22        MR. STEADMAN:  I have no further questions.

23        THE COURT:  Redirect?

24        MS. DAVIS-TANNER:  I have about four questions, Your

25 Honor.

1          THE COURT:  Fire away.  I'm counting.

2          MS. DAVIS-TANNER:  I'm sorry?

3          THE COURT:  I'm counting.  No.  I'm kidding.

4          MS. DAVIS-TANNER:  Perfect.

5          THE COURT:  If you go to five or six, I won't say

6   anything.  Lawyers usually say, "I just have one question," and

7   then they ask ten or twelve.  And you all know that because

8   you've seen it before.  But go ahead.  Fire away.  I'm just

9   teasing you.

10          MS. DAVIS-TANNER:  Fair enough.

11                      REDIRECT EXAMINATION

12  BY MS. DAVIS-TANNER:

13  Q.    At the time you were all making the classification

14  decision, did you think the fact that a consumer doesn't need a

15  prescription for an LG refrigerator to be the most important

16  difference between the brand advocates and the pharma reps?

17  A.    That never crossed my mind, no.

18  Q.    Now, moving back to the Department of Labor investigation.

19  Was the investigation with regard to exemptions still ongoing in

20  December?

21  A.    Yes.  For the brand advocates, yes.

22  Q.    And by December 23 of 2011, was it clear to you that the

23  Department of Labor was going to find that the brand advocates

24  were misclassified?

25  A.    Yes.

1   Q.   Mr. Steadman asked you a few questions about travel time.

2   A.   (Witness nods head.)

3   Q.   Now, were the brand advocates actually paid for their

4   travel time?

5   A.   In between stores they were, yes.  That would have been

6   included in the first store to the -- checking in the first

7   store to checking out the last store.

8            MS. DAVIS-TANNER:  That's all I have.

9            THE COURT:  All right.  That's four.  How about that?

10      Recross?

11           MR. STEADMAN:  None, Your Honor.

12           THE COURT:  Okay.  You can step down.  Thank you.

13      Call your next.

14           MR. FALASCO:  Your Honor, ActionLink will be calling

15   Del Tanner.

16           THE COURT:  Mr. Tanner, come forward and be sworn.

17           MR. FALASCO:  Is it okay if he stays?

18           THE COURT:  If he's not going to be called back, he

19   can stay.  It's up to you.  But if he stays in, he can't be

20   called back to testify.  That's the point.  So you all make your

21   own decision.

22           MR. FALASCO:  Why don't you step outside.

23      **DELBERT H. TANNER, JR., DEFENDANT'S WITNESS, DULY SWORN**

24                        DIRECT EXAMINATION

25   BY MR. FALASCO:

1    Q.    Good morning.  Will you state your name for the record?

2    A.    Delbert Hodges Tanner, Jr.

3    Q.    Mr. Tanner, you go by "Del"?

4    A.    I do.

5    Q.    All right.  Have you ever given testimony in court before?

6    A.    I don't remember.

7    Q.    All right.  It's kind of nerve-racking, isn't it?

8    A.    Yes, it is.

9    Q.    We'll try to work with you on that.  Okay?

10   A.    Thank you.

11   Q.    Where do you work right now, Mr. Tanner?

12   A.    ActionLink.

13   Q.    And how long have you worked there?

14   A.    I've worked there for about eight and a half years.

15   Q.    And what did you do prior to working at ActionLink?

16   A.    Most significantly prior to ActionLink, I owned a company

17   called Channel Partners, which was a competing company to

18   ActionLink.

19   Q.    All right.  So we know Channel Partners is a competing

20   company.  What did Channel Partners and what does ActionLink do?

21   A.    Both companies are involved in the outsourced sales and

22   training in the retail channel.

23   Q.    And at Channel Link --

24   A.    Channel Partners.

25   Q.    -- Channel Partners -- excuse me -- how long were you

1  there?

2  A.    I owned that company for about ten years.

3  Q.    So you were the owner?

4  A.    Yes.

5  Q.    Did you also operate the company?

6  A.    Yes, I did.  I operated as the president.

7  Q.    And so how much experience do you have in this line of

8  work?

9  A.    About twenty years.

10  Q.    And at different levels?

11  A.    Well, yeah.  I started Channel Partners, so when I started

12  it, there was three of us.  And it was a very, very small

13  company initially, and so I was -- you know, I was virtually

14  everything in the beginning.  And, of course, that grew and got

15  bigger, and then I sold it.  And then when I joined ActionLink,

16  I joined as the COO.

17  Q.    And did you become familiar with industry standards in this

18  area of work, in your space?

19  A.    Yes, I'm pretty familiar with industry standards in our

20  little niche industry.  Yes.

21  Q.    Tell me how you developed that knowledge, besides just

22  being a president and --

23  A.    Number one, it is a pretty small industry, and so all of

24  the players pretty much know each other.  By "players," I mean

25  the owners of the different companies, the vendors, meaning the

1    clients, as well as providers of solutions.  So, for example,

2    there was testimony earlier about Natural Insight, which is the

3    reporting tool or the platform, the technology that we use to,

4    you know, gather all of our information in the field, that

5    company also contracts with many of our competitors and other

6    companies in the industry.  So as you're having conversations

7    with people like that, you quickly come to know, you know, what

8    different practices and things are in the industry.

9    Q.   And you said you were the COO of ActionLink.  Correct?

10   A.   Yes, I am, currently.

11   Q.   And you have been for how long?

12   A.   I have been the entire time I've been there.

13   Q.   And what does that stand for?

14   A.   Chief operating officer.

15   Q.   Is there anybody higher than you at the company?

16   A.   Yes.  There is the CEO.  I report to the CEO.

17   Q.   What kind of decision-making power do you have as the COO?

18   A.   I pretty much have -- the operational decisions are pretty

19   much entirely mine.

20   Q.   And would you consider decisions about employment

21   classification to fall into the operational decisions?

22   A.   I would, yes.

23   Q.   And do you consult -- who is the president or the owner?

24   A.   The CEO is the majority owner of the business.

25   Q.   And what is his name?

1   A.    Bruce Finn.

2   Q.    Do you consult with Bruce before you make decisions?

3   A.    Then or now?

4   Q.    Then.

5   A.    No.  At that point he probably would not have been involved

6   in that decision.

7   Q.    All right.  And what kind of employment decisions do you

8   make or did you make as the COO?

9   A.    So decisions around, you know, full time versus part time.

10  There's been a lot of discussion in our industry and in our

11  business about 1099 contractors versus W-2 employees, probably

12  actually more about that than exempt status.  But, you know,

13  exemption status and all those kinds of things.

14  Q.    Now, do you do that on your own?

15  A.    No, I don't.

16  Q.    Who else do you rely on to help you make those decisions?

17  A.    Well, we have an HR department, we have a recruiting

18  department, which both of those departments are filled with

19  people who have made a career out of, you know, HR and HR

20  compliance and whatnot.  But because our business is fairly

21  unique from the standpoint that it's a pretty small business but

22  we operate in all 50 states, we contract with an outside company

23  to provide HR management, support, compliance, and those kinds

24  of things, because it's virtually impossible for a company

25  that's as small as ours to on our own know how to be compliant

1   in every single state across the country.

2   Q.    Now, in your business, you talked about it, it is a little

3   bit of a strange business, right, like you said, retail driving

4   sales?

5   A.    Yes.

6   Q.    So how is success of your company measured in your

7   business?

8   A.    So the only reason the companies hire us is to increase

9   sales.  And our performance, our metrics, everything that we're

10  measured on is measured on how much we're able to increase

11  sales.  We have an entire analytics department that just aids

12  our customers in, you know, complex analysis of, you know,

13  driving incremental sales.  And at the end of the day if the

14  programs that we put in place for our clients don't return an

15  investment through increased sales, we don't keep the business.

16  Q.    And who are the lead field employees that are driving those

17  sales?

18  A.    I'm not sure I understand what you --

19  Q.    What position at ActionLink would you characterize as the

20  person that's driving those sales?

21  A.    So it would be field reps.  So generically we refer to them

22  as field reps.  Some clients call them brand advocates, some

23  clients call them MDMs, which stands for market development

24  managers.  Every client of ours kind of has their own, you know,

25  their own term that they like to refer to them as.  We call them

1    field reps.

2    Q.    Okay.  Is that the same as a brand advocate?

3    A.    A brand advocate is a field rep, yes.

4    Q.    Now, where is your company headquartered?

5    A.    In Akron, Ohio.

6    Q.    And where are the employees located?

7    A.    All over the country.

8    Q.    How many employees do you have at ActionLink?

9    A.    Between full-time and part-time employees nationwide, we

10   have anywhere between three to four thousand employees.

11   Q.    Let's talk about the brand advocate position which is at

12   issue here.  Okay?

13   A.    Uh-huh.

14   Q.    Can you first tell the Court about the program at LG that

15   these brand advocates, the plaintiffs, were working in?

16   A.    Well, LG put out an RFP, which is a request for proposal,

17   sometime in 2010, soliciting a company to consolidate all of

18   their different, what we would typically refer to as programs.

19   So at the time, LG had three different companies, not

20   ActionLink, but competitors to ActionLink, that serviced

21   different components of their entire retail strategy.  So, for

22   example, they had one company that did nothing but their

23   merchandising.  They had another company that did nothing but

24   their sales and training.  They had another company that handled

25   specifically the Sears channel, because LG manufactures the

1   Kenmore appliance line, and they had one team with one specific

2   company that did nothing but handle the Kenmore line for them.

3   And their attempt was to take all of those contracts and all of

4   those companies, consolidate them into one company that could

5   provide all of those services.  And we were successful in

6   winning the contract to, you know, consolidate all of that

7   together.  So we put together, in conjunction with LG, a

8   strategy to kind of bring that all underneath the ActionLink

9   house and provide all those services kind of with one stop, if

10  you will.

11  Q.    So, generically, what was the purpose of that program?

12  A.    Well, it was to drive sales, and specifically it was to

13  increase their market share compared to Samsung, because Samsung

14  was kind of the target that they had their eye on to try to

15  overtake.

16  Q.    And can you give kind of a generic idea of what type of

17  position operated in that Slingshot Program?

18  A.    Sure.  So the Slingshot Program was generally characterized

19  into three sort of high-level positions.  We had field managers,

20  which were managers who managed the reps.  Within the rep

21  designation, there was basically two teams of reps; there was a

22  team of merchandising reps and then there was a team of brand

23  advocates.  The brand advocates were further divided into

24  appliance versus electronics, et cetera.  But, generally

25  speaking, it was brand advocates or merchandising reps.

1    Q.    Had you ever employed brand advocates before in your line?

2    A.    Yes.

3    Q.    And did you do that in connection with your prior company?

4    A.    I did it in connection with my prior company, as well as,

5    you know, at ActionLink.

6    Q.    And from an industry standard, how were those employees

7    typically classified?

8    A.    So a brand advocate is either full time or part time.  A

9    lot of brand advocates in our industry are part time.  In this

10   particular case, they were all full time, and that was -- a

11   full-time position is very, very desirable for a field rep,

12   because most of the work is part time.  So there was a

13   significant focus on making sure that these were full-time

14   positions.  And in our industry, when you have a full-time

15   dedicated -- that's kind of how we describe it -- brand

16   advocate, it's common industry practice that they are salary

17   exempt.

18   Q.    I'm going to show you what's been marked as Exhibit 4.

19   It's in your binder.  I'm going to step over here so we can all

20   look at it together.  And can you kind of briefly describe what

21   this document is, Mr. Tanner?

22   A.    This is the job description that we put together for the

23   brand advocate position on the LG Slingshot Program, and it

24   looks like it encompasses both the home electronics brand

25   advocate as well as the home appliance brand advocate.

1   Q.    Is this position description completely exhaustive of what

2   a brand advocate would do in the field?

3   A.    Probably not.

4   Q.    Okay.  But it gives you a good idea of what their job

5   duties are?

6   A.    Yes.  I hope so.

7   Q.    Looking at the position summary, I've highlighted some

8   language, and that first language I've highlighted here says

9   that part of their job is "driving sell-through and

10  recommendation rates."  Can you tell the Court what that is?

11  A.    Right.  So one of the most influential -- well, the single

12  biggest influential thing in a retail store when a consumer buys

13  something is the recommendation of the sales associate.

14  Consumers typically will walk into a store -- less so these days

15  than back in 2011.  But typically a consumer will walk in and

16  they will rely on the recommendation of a sales associate.  And

17  so one of the indicators of whether we're moving the needle or

18  not is whether or not we're able to increase the recommendation

19  rate of the sales associate.  When we're in the store, we are

20  interfacing with the customers, so, obviously, we are

21  recommending and trying to drive sell-through.  "Sell-through"

22  is a term commonly used in the retail industry because a brand,

23  like LG, will sell in to a retailer.  And so LG may sell, you

24  know, a hundred thousand TVs to Best Buy, but they're not sold

25  yet.  They don't get sold until they get sold through to the

1    customers.  That's where companies like us come in.  Because a

2    company like LG will sell in to Best Buy, and then a company

3    like us sells it through and actually sells it to the customers

4    on the floor.  So we had to drive sell-through through our own

5    efforts and recommendation rates of sales, you know, the

6    retailer's associates, not us, while we weren't in the store.

7    Q.    Were the actual sales of LG products measured?

8    A.    Yes.

9    Q.    So you could tell -- you could identify what types of sales

10   were attributable to the brand advocates?

11   A.    Yes.  So we had regular, I want to say, monthly reporting

12   by store, by rep, and by product line, how many units were being

13   sold.  And we had test and control measurements put in place to

14   differentiate between, you know, sort of the organic sales that

15   were taking place naturally and the sales that were taking place

16   as a result of our efforts.

17   Q.    Would your business line exist if sales weren't tied to

18   what you did?

19   A.    Well, if sales weren't tied to what we did, then it's

20   called the promotion industry, and that is typically a -- in our

21   industry, there's a big difference between what are called demo

22   days or promoter events, which is basically just handing

23   materials out, handing a brochure out, handing, you know, a food

24   sample out or demonstrating some kind of a product.  It's kind

25   of like a public service event type of a thing.  And we don't --

1    we don't do that.  And we almost get offended, actually, when

2    you get companies that are looking for that kind of service come

3    to a company like ours, because our business is completely

4    driven by return on investment and funding what we do through

5    the incremental margin that's generated from the extra products

6    that we're selling.

7    Q.    And so in your industry are brand advocates considered

8    promotional?

9    A.    No.

10   Q.    Over here, the next -- there's some other highlighted

11   sections, and it talks about "facilitate in-store activities to

12   optimize sales and visual merchandising."  Can you give the

13   Court a broader understanding of what that means?

14   A.    Sure.  So there's a number of ways that something gets sold

15   in a retail store.  Sometimes if we're not there or the retail

16   associate that works at that store is not available or they're

17   helping another customer or whatever, most of the time what the

18   brand and the retailer have to rely on in that case is what we

19   call the visual merchandising of the store.  So a customer walks

20   in, you have an endcap, or a display, or the product is on

21   display with some sort of what's called POP, or point of

22   presence, materials that help explain to customers, you know,

23   how to make decisions about what to buy, et cetera, et cetera.

24        So our job is to, number one, is to make sure that

25   whatever's going on inside that store, whether it's while we're

1    there or while we're not there, that all of those elements are

2    optimized, that retail sales associates that work for the store

3    are pushing the LG products when we're not there; that the

4    visual merchandising, the physical presence in the store is

5    perfect, it's functional, it's clean, it's compliant is what we

6    call it.  So we did everything that was in our power and in the

7    rep's power to optimize those things.  Sometimes it would even

8    be, you know, a brand advocate could negotiate with the store to

9    get better placement of a display product so that maybe when a

10   customer walks right into a department, the first thing they see

11   is, you know, an LG product as opposed to Sony or Samsung.  And

12   the brand advocates -- so an example of facilitating in-store

13   activities, maybe going to store management and saying, hey, is

14   it possible for me to maybe move this LG display over here so

15   it's more prominent, et cetera, et cetera.

16        So those are the kinds of things that brand advocates were

17   doing in the stores.

18   Q.    Now, I've learned a term from you, high drive and low drive

19   times.

20   A.    Okay.

21   Q.    Maybe I said --

22   A.    Well, yeah, just drive times in general.

23   Q.    What do you mean by that?

24   A.    So in retail you have designated drive times, which is when

25   -- it's periods of high buying activity.  So if you think about

1   back to school, back to school is a typical drive time in

2   retail.  And there are specific product categories that will

3   focus and augment their sales activities during back-to-school

4   drive time.  There's holiday drive time.  There's dads and grads

5   drive time.  So you've got specific, you know, periods of time

6   where different categories, like, for example, TVs are really

7   hot through the holiday, but it extends through Super Bowl

8   because everybody's buying TVs for Super Bowl.  So it is common

9   knowledge that beginning right around November, at Thanksgiving,

10  all the way to Super Bowl, that's a really heavy drive time for

11  TVs.  As people are graduating from school, you know, right

12  about now, cameras, digital imaging is a big category because

13  kids are going off to college, you know, things like that, and

14  they're getting presents for dad.  So dads and grads is another

15  drive time.

16  Q.   What do brand advocates do in stores during high drive time

17  periods?

18  A.   So brand advocates typically would always work -- so

19  weekends are also a drive time.  So if you look at traffic

20  patterns in retail, in CE retail, consumer electronics retail in

21  a Best Buy or in maybe a more regional chain, most of the

22  traffic and most of the buying happens on the weekends.  And I

23  think maybe even our position description might talk about this.

24  But our reps were, or our brand advocates, anyway, were expected

25  to work a fairly nonconventional workweek, because a weekend for

1   them needed to be like Monday and Tuesday, where Wednesday

2   through Sunday they would work their normal week, and on

3   Saturdays and Sundays they would need to spend most of their

4   time actually in the store, in front of customers, because

5   that's when all the traffic is taking place.

6   Q.   So let's turn to this section marked "Position Duties," and

7   the "sales metrics" is my language.  But can you describe to the

8   Court this first bullet point and what those things relate to on

9   the brand advocate position?

10  A.   Yeah.  So when we put this program together with LG, LG --

11  one of the reasons why we won the contract in the first place

12  was because LG wanted a company that was willing to, what we

13  refer to in the industry, put skin in the game.  They wanted us

14  to be incented based upon actually achieving sales metrics.  If

15  you didn't sell what you're supposed to sell, then you're not

16  going to -- we're not going to pay you; if you do, then we will.

17       So there was a heavy, heavy component of KPIs, key

18  performance indicators, and they were very, very adamant that

19  those KPIs are what drives their payment to us and our payment

20  to the reps.

21       And so the very first thing, at least for the brand

22  advocates, these were basically the top three KPIs that LG was

23  requiring us to drive.  So, you know, sell-through performance

24  targets, in-store market share targets.  So sell-through

25  performance targets is just sales; how many sales are actually

1    taking place at the store level.  In-store market share, so

2    that's a function of, you know, if LG has 20 percent market

3    share and Samsung has 60 percent market share and we're trying

4    to get our market share up to say 30 or 40 percent and take some

5    of it away from Samsung, take some of it away from Sony, some of

6    it from Panasonic, there was specific market share targets that

7    we were given that we had to increase that market share rate.

8         And then the recommendation rate was what I had mentioned

9    earlier, where we would actually engage a -- ActionLink would

10   engage a third-party company to go send people that we didn't

11   know into stores to pose as shoppers with a store associate, and

12   actually sometimes with our own salespeople as well, to what we

13   refer to as "secret-shop" those people, and we would measure

14   recommendation rate by the sales associates in a store.

15        And so that was what that KPI was referring to.

16   Q.   Can you tell the Court about the brand advocate's role in

17   directly talking with consumers?

18   A.   So when the reps were in the store during drive times like

19   the weekends when there's a lot of customers, they would

20   actually sell to customers and assist customers.  One of the

21   reasons why our industry, our business model even exists today

22   is because retailers can no longer afford to pay for all the

23   labor on the floor in their stores, so they continue to cut

24   labor back more and more, and that puts the burden on the

25   manufacturers, the Bose, the Sonys, the Microsofts of the world,

1  the LGs of the world, to put their own sales labor on the floor.

2  And you're seeing it more and more in retail now.  So during a

3  weekend, it's very, very possible that you have more customers

4  in a department buying cameras or TVs or headphones, or

5  whatever, than you have associates to help them.  And so during

6  the weekends, that's why our associates were instructed to

7  spend -- to basically camp out in the store and interface

8  directly with the customers to sell LG product.  During the

9  week, when they were making visits to the stores during the

10 week, that's when they would spend time talking to the

11 associates and enhancing the mind share.  You know, we would,

12 you know, buy them things.  We would bring pizza and doughnuts

13 and coffee and try to build relationships with those people so

14 that when we weren't in the store, they were loyal to LG and

15 they were kind of carrying the LG banner and selling the LG

16 product when we weren't there.  If we're in the store and we're

17 selling and they're standing next to us and they're selling as

18 well, and they see that we're 5 feet away, and they're talking

19 to a customer about TVs and we're talking to a customer about

20 TVs, they're probably going to recommend the LG brand because

21 they know we're right there, but we want them to do that even

22 when we're not there.

23 Q.   So did brand advocates also have other people that worked

24 underneath them in high drive times?

25 A.   So during holiday drive times and other seasonal drive

1   times, the brand advocates hired sales reps who didn't engage in

2   any training at all.  They would simply work a store, typically

3   Fridays, Saturdays, and Sundays, and augment the store retail

4   staff to sell LG product.  And in some stores we would actually

5   have two people; we would have the brand advocate and one of

6   what we call assistive sales reps, or ASRs.  But in some stores

7   we would actually have an ASR working directly with the brand

8   advocate on the floor.  But each brand advocate would have, you

9   know, three, four, five, eight different sales reps that were

10  part time that worked for them on the weekends, selling in

11  stores.  The brand advocates, obviously, could only be in one

12  store at one time, so they would hire part-time salespeople to

13  work for them and sort of extend their reach.

14  Q.   When you were hiring brand advocates, what were you looking

15  for, as the employer?

16  A.   So what we look for in a brand advocate is somebody who --

17  we have a whole series of pre-employment testing and assessments

18  that we do that look for specific attributes, you know, things

19  like conscientiousness, attributes of a person that will be

20  inducive or sort of indicative of their ability to sell, to, you

21  know, be really good at customer service and engaging with

22  customers.  And so sometimes our clients want us to look

23  specifically at how much retail sales experience, you know, our

24  reps have.  Our experience has shown that how much experience

25  somebody actually has in a retail sales environment isn't

1    necessarily indicative of their ability to succeed in the

2    future.  But in this particular case, even LG, you know, they

3    wanted to know, you know, they wanted to see that everybody had,

4    you know, three years of retail sales floor experience, et

5    cetera, et cetera.

6    Q.    And did you look for those same attributes in all your

7    field representatives?

8    A.    Brand advocate representatives or any rep?

9    Q.    All fields.

10   A.    No.  No.  Different positions have different, you know,

11   different attributes that we look for.  For example, one of the

12   reasons why we specifically separated out a team of

13   merchandisers versus a team of brand advocates is the attributes

14   that a merchandiser needs to be successful are completely

15   different than the attributes that a salesperson needs.  And our

16   experience, and my personal experience doing this for 20 years,

17   those attributes typically do not cross over between those two,

18   so we hire separate people and have separate teams.

19   Q.    What is your experience of brand advocates moving from

20   company to company or program to program?

21   A.    We try to minimize it because we invest a lot of money in

22   training our people.  But it happens.  You know, it happens

23   occasionally and people will move both between programs within

24   our company as well as, you know, leave our company and go and

25   work for another company, you know, as a brand advocate or as a

1    sales rep.  So it's pretty commonplace that it happens.

2    Q.    And when that happens, whether they come to you or leave

3    you, is that an opportunity where you learn how these types of

4    employees are paid?

5    A.    Yeah.  Because when we go and hire somebody from a

6    competitor, the first thing we do is we start saying, well, how

7    do they do this and how do they do that, and how did they handle

8    this and how did they handle that.  So there's not really any

9    secrets in our industry.  It's pretty much a wide-open book.

10   Q.    And from an exemption status, what's the industry standard

11   for brand advocates?

12   A.    For full-time brand advocates, it's -- I don't know a

13   company in our industry that doesn't classify full-time brand

14   advocates anything other than exempt.  In other words, everybody

15   in our industry that I'm aware of classifies them as exempt.

16   Q.    And do brand advocates then receive sales training?

17   A.    Yes, they do.

18   Q.    Okay.  How long is that training?

19   A.    It depends on the program, and it depends on our clients'

20   appetite and willingness to spend for it, because it costs a lot

21   of money to spend time with all of these people.  But in the

22   case of LG, we spent two weeks in Florida with everybody, you

23   know, just two weeks solid going through all of the training

24   that we needed to initially launch the program, and then we had

25   periodic market trainings.  So you may take, you know, say a

1  region of the company, the Southwest or the Northeast, and do a

2  regional training that might last a day or two, and then every

3  year we would do another centralized training where we brought

4  everybody from the whole country into one place.

5  Q.    Are brand advocates, though, limited in the way they

6  operate by their training?

7  A.    No.

8  Q.    What else do they do?

9  A.    Well, you know, the reason why we hire people with certain

10 attributes is so that they can think and react in situations

11 based upon the skill set that they have, whether it's, you know,

12 attributes, which we believe attributes are not necessarily

13 something that's trained, it's something that somebody has, or

14 skills, which is something that is trained, and whether it's

15 something we trained or something they've been trained on in the

16 past.  But that entirety, kind of that package of that person is

17 why we hire them, because we know that they're going to, or we

18 hope that they're going to do a good job.

19 Q.    Did you expect them then to follow a script when they were

20 in a store?

21 A.    Not a script.  We just had objectives that we measured them

22 against.

23 Q.    Did they have discretion on how to meet those objectives?

24 A.    They had full discretion on how to meet the objectives, as

25 long as they met them.

1    Q.    So you talked about sales and marketing being an objective

2    measure that LG passed down to you.  Did you pass those sales

3    metrics information to the brand advocates?

4    A.    Yes.

5    Q.    Why?

6    A.    Because they needed to know whether or not they were

7    performing or not.  They were regularly measured on how well

8    they're performing.  And it's kind of hard to hold somebody

9    accountable to a goal that they don't know exists.

10   Q.    Let's turn to this decision about classifying the brand

11   advocates in the LG Slingshot Program that's at issue here.

12   Okay?

13   A.    Uh-huh.

14   Q.    Were you involved in that process?

15   A.    I was.

16   Q.    Tell me in a broad way how that process occurred.

17   A.    So we had -- as Dave Gries mentioned, we have a team of

18   people who basically -- you know, once we won the contract and

19   we started the recruiting process, you know, we had to create

20   the job descriptions, post them, et cetera.  And one of the

21   things that needed to be decided is how are these people going

22   to be classified.  So the first thing that our team -- our team

23   did is reach out to Oasis and say:  Okay.  You know, you're the

24   experts here.  Tell us, you know, what do we need to do?  Dave

25   had obviously gone and done some research on his own on the DOL,

1    pulled down some documents from the DOL, but we also obtained

2    kind of like a guideline document or kind of a -- some

3    documentation from Oasis in terms of, look, this is how to sort

4    of navigate the waters of FLSA exemptions and here's the

5    different exemptions that exist, here's what would qualify under

6    these exemptions, and here's some examples of the types of

7    positions that would qualify under each of these various

8    exemptions.  So there was that document and other documents,

9    and, obviously, the experience of people that worked for us, and

10   some of them had years of experience in labor investigation

11   positions.  One of them was a law school graduate who had spent

12   time investigating, you know, employment claims and things like

13   that.

14        So we had a pretty -- a pretty qualified team, at least

15   what I thought was a pretty qualified team, certainly more

16   qualified than me, that was, you know, vetting all of this stuff

17   out.  They then brought all of the stuff together.  They had a

18   series of meetings and things internally.  They then said:  Hey,

19   Del, we want you to come to -- you know, can we have one

20   meeting, wrap all this up, put it to bed, go through all the

21   facts and make a decision?  So I attended this, you know, what I

22   -- I kind of -- it's a standout meeting in my mind, this kind of

23   roundtable meeting where everybody got together and, you know,

24   walked through all the things that we had learned and researched

25   and been told in order to make a decision as to whether or not

1    these people would be full-time exempt or salary exempt.

2    Q.    Did ActionLink take that process seriously?

3    A.    Yes.

4    Q.    Did you take that process seriously?

5    A.    I did.

6    Q.    So you get into this roundtable meeting where all the

7    information has been gathered.  That's where we're at.  And tell

8    me about that meeting and your role and involvement.

9    A.    Well, so, I didn't actually -- to be frank, I didn't

10   realize it was as big of a deal as it was when I first kind of

11   walked into the meeting, and then it was obvious that like this

12   was a serious issue.  And, you know, in going through, and, you

13   know, this team sort of telling me what all of the, you know,

14   the factors and the pros and the cons and the things that

15   support this versus the things that don't, you know, we went

16   through all of that.  And there was -- you know, there was

17   really two discussions.  There was, number one -- you know,

18   because there were two different teams of people.  There was

19   merchandisers and there was brand advocates.  And so there was

20   some conversation about, you know, whether one team versus the

21   other qualified as exempt and, if so, under what exemption.  And

22   when we got to -- in the documentation that Oasis, our HR

23   management company, provided us, under the sales exemption, it

24   says an example of a position that would qualify under the sales

25   exemption is a pharmaceutical rep.  And that was -- that was

1    like the end-all, be-all.  As we're sitting there deciding

2    whether or not this sales exemption makes sense, we saw the

3    example of the pharmaceutical rep as a position that qualifies

4    as exempt under the sales exemption.  And for years we've been

5    describing our industry to people who don't understand it, we

6    use the pharmaceutical rep business model as a description of

7    what our industry is and how we operate, and we have my whole

8    life.  And so, literally, I can't think of another -- another

9    business model or position that more closely mirrors what we do

10   than the pharmaceutical rep business model.  So when we saw that

11   as an example, I thought, wow, I mean, there's probably a

12   gazillion positions and roles that they could have used as an

13   example of a position that qualifies as exempt under the sales

14   exemption and they just happened to use an obscure position of a

15   pharmaceutical rep that just happens to be exactly what we do?

16   And that was -- that sealed the deal in my mind.  And the only

17   question from that point on for me was -- I knew -- I knew a lot

18   of people in the pharmaceutical rep world.  I knew at a high

19   level what they did, but I wanted to know specifically how their

20   business model operated at a pretty granular level.  So I

21   started making phone calls to people that I knew that were

22   pharmaceutical reps and started asking them a lot of questions

23   about, you know, How are you paid?  How are you measured?  Do

24   they tell you what doctors you have to go to every single day or

25   are you just given a group of doctors and say, you know, visit

1  them?  And the answers that I got back was, Well, we're given a

2  group, but we can go visit them whenever we want.  So are you

3  tracked on sales?  Well, yeah, they track us based upon the

4  prescriptions that get written.  And so I went through and asked

5  all of these people these questions to determine whether or not

6  I felt like the parallel between what our brand advocates do and

7  what a pharmaceutical rep does, are they really parallel, do

8  they really mirror each other?  And to be honest with you, I

9  expected to find some nuanced differences in the role that would

10  cause me to go, maybe we better take a look at this.  And

11  everything that I learned as I talked to pharmaceutical reps was

12  that the model actually more closely resembled our brand

13  advocate model than I had even originally thought.

14       So it just completely solidified for me, that I've got this

15  document that's provided from the company that we paid to advise

16  us on these things, telling me that a pharmaceutical rep is a

17  bona fide example of a qualifying example, and I have these

18  pharmaceutical reps now who are telling me and describing their

19  job and their compensation models, their performance metric, you

20  know, methodologies that are identical to what we do and how we

21  operate.  And so we made the decision to go ahead and make them

22  exempt.

23  Q.    So you talked about these telephone conversations with

24  pharmaceutical reps.  Did you do that during the roundtable,

25  before, or after?

1    A.    After the roundtable.

2    Q.    So when you were at the roundtable, what was your

3    preliminary decision?

4    A.    And I may have done it before the roundtable because I'd

5    been given an advanced copy of the documents and stuff like

6    that, so it may have been right before or right after, but it

7    was right around that time as we were debating the issue.

8          Sorry.  What was the question?

9    Q.    What was your preliminary decision at that roundtable on

10   how to treat these brand advocates?

11   A.    That they were exempt.

12   Q.    Was that generally shared by the group?

13   A.    Not entirely.

14   Q.    Okay.  But a majority?

15   A.    I would say all but one.

16   Q.    And you took those issues into consideration?

17   A.    Oh, yeah.  Yeah, of course.

18   Q.    And who ultimately made the decision then?

19   A.    I did.

20   Q.    And when you made that decision, did you believe you were

21   doing it properly?

22   A.    Absolutely.

23   Q.    And why did you think that, besides what you already told

24   us about the pharmaceutical rep?

25   A.    I thought I was doing the right thing because we had looked

1    at everything, every resource that we had available to us, we

2    consulted and determined that, you know, this was the right

3    thing to do, that this was -- that this was the appropriate and,

4    you know, legal thing, I guess if you want to say that, to do.

5    Q.    And did you consider whether brand advocates would be

6    trying to get sale commitments on the floor while they're out

7    there?

8    A.    Yeah.  I mean, I -- yeah.

9    Q.    Was that part of their job?

10   A.    It was the most highest level KPI that they were measured

11   on.

12   Q.    How much were the brand advocates paid?

13   A.    It averaged about 42,000 a year.

14   Q.    You testified earlier, I think, that ActionLink's home base

15   is in Ohio?

16   A.    Yes.

17   Q.    Where did the brand advocates work?

18   A.    All over the country.

19   Q.    Did they work away from the office?

20   A.    They did.

21   Q.    Was there any advantage to the brand advocates to be paid a

22   salary, in your opinion?

23   A.    There was.  It was generally viewed as a status thing for

24   them.  So it was desirable for somebody who is a brand advocate

25   in our space to have a full-time salaried position like that.

1    It's an attractive thing for them.  So besides being an

2    appropriate action, which we felt it was, it was also viewed --

3    and this was also coming from interviewing, you know, brand

4    advocates that we knew -- it was also viewed as an inducement,

5    as something that would be attractive to them.  We were trying

6    to attract candidates to come and work on this program.  Both

7    from within our company as well as from outside the company,

8    it's generally viewed as an attractive attribute of the job.

9    Q.    We heard some testimony from Mr. Gries about involvement in

10   the Department of Labor investigation.  Were you also involved

11   in that investigation?

12   A.    I was.

13   Q.    Tell the Court your experience.

14   A.    So we got a visit at the front desk one day of our office

15   from somebody telling us they were from the Department of Labor.

16   I went and got HR.  We had a meeting.  And they basically told

17   us that they were there to investigate a complaint that had been

18   filed from one of our merchandisers on the LG program about

19   their exemption status and not getting paid overtime and those

20   kinds of things.  And so we had a meeting with the DOL.  They

21   said:  Look, we're here to investigate this merchandiser

22   position.  We're okay with the brand advocate position.  We

23   don't feel that that's misclassified, but we want to look into

24   this merchandising thing.  So a number of meetings and phone

25   calls and communication took place.  And ultimately -- and when

1    the DOL told us that they felt that the merchandisers were not

2    qualified to be exempt, we listened to them.  We said:  You

3    know, that's okay.  You know, okay.  Sorry.  You know, let's --

4    what do we need to do?  Let's make it right.  And that's when we

5    worked through the issue with them, and they worked with Dave

6    Gries, and, you know, they worked through our data collection,

7    you know, what did we have available from a data standpoint.

8    They went out and did field interviews with our reps and all

9    this stuff, and it all kind of culminated with the DOL saying:

10   Okay.  Here's how you should pay these people and here's what

11   you need to do.  And we did it.  Right as we were, you know, in

12   the process of writing these checks to these merchandisers, the

13   DOL came back and said:  I know we told you we were okay with

14   the brand advocate position being exempt, but we want to take a

15   look at that too.  What do you think?  We think maybe we should

16   take a look at that as well.  And we didn't agree, but we were

17   told from counsel that you do not argue with the DOL and don't

18   make waves, just do it.  So we ultimately ended up, after we'd

19   already paid the merchandisers their back wages, we went through

20   the exact same exercise with the DOL and the brand advocates and

21   made payments to brand advocates as well.

22   Q.   How would you describe your level of cooperation with the

23   Department of Labor?

24   A.   Extremely high.

25   Q.   Did you take it seriously?

1   A.    Very seriously.

2   Q.    Is there anything that you did not give the Department of

3   Labor that they asked for?

4   A.    Not to my knowledge.

5   Q.    And ultimately you said you followed the Department of

6   Labor's recommendation?

7   A.    Yes.

8   Q.    And did you then try to quickly do the reclassification?

9   A.    We did.

10  Q.    And why?

11  A.    Because we didn't want to make waves with the Department of

12  Labor and we wanted to make sure that we were doing everything,

13  you know, by the book and everything that we needed to do.

14  Q.    Has that always been your intent?

15  A.    Uh-huh.  Yes.

16  Q.    So when you were making the decision, did you have that

17  same idea in mind?

18  A.    In making the decision to classify them?

19  Q.    Yes, sir.

20  A.    Absolutely.

21  Q.    Did you take affirmative steps to determine whether brand

22  advocates were exempt?

23  A.    I believe we did.

24  Q.    And can you summarize what those steps were?

25  A.    The most important is that we consulted our professional

1    that we lean on for all compliance and legal-related matters as

2    it relates to employment, Oasis.  We also had all of our people

3    do what we thought was a pretty exhaustive analysis of the

4    issues and relied upon documents that the Department of Labor

5    themselves put out to employers to help them guide them through

6    these decisions.  And we thought we were doing the right thing.

7    Q.    And did you believe when you made that decision that the

8    brand advocates were properly classified as exempt?

9    A.    Yes.

10   Q.    Was one of the things you looked at -- and you testified

11   about it earlier -- industry standards?

12   A.    Yes.

13   Q.    And how were the industry standards related?

14   A.    They were extremely relevant in this case.  These reps who

15   worked on this LG program, many of them came from another

16   company working on the LG program previously, they were salaried

17   exempt.  When we lost the program and it went to another

18   company, they also were salary exempt and still are today.  So

19   the only time that that position has ever come into question in

20   the 20 years that I've been in business is during the two years

21   that these particular reps were on this particular program.

22   Q.    And does ActionLink ultimately endeavor to treat its

23   employees fairly?

24   A.    Yes.

25   Q.    You believe ActionLink treated the brand advocates fairly?

1   A.   I do.

2          MR. FALASCO:  I have no further questions at this

3   time.  I'll pass.

4          THE COURT:  Why don't we take a 15-minute recess.

5          MR. FALASCO:  Thank you, Your Honor.

6       (Recess from 10:27 a.m. until 10:43 a.m.)

7          THE COURT:  Everyone, be seated.

8       Mr. Steadman, you may cross.

9          MR. STEADMAN:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11  BY MR. STEADMAN:

12  Q.   Good morning, Mr. Tanner.

13  A.   Good morning.

14  Q.   First, I want to talk a little bit about the job

15  description, Defendant's Exhibit 4, if you can get that in front

16  of you.

17  A.   Yes.

18  Q.   All right.  The job description says driving sell-through

19  and recommendation rates is the job of a brand advocate.

20  Correct?

21  A.   Yes.

22  Q.   And maintaining display hygiene.  Correct?

23  A.   Yes.

24  Q.   And you testified that you don't consider that promotional

25  work.  Is that true?

1    A.    Correct.

2    Q.    You said promotional work is kind of a dirty word.  Why is

3    that not promotional work?

4    A.    Because promotional work in our industry is work where

5    you're simply giving information to a customer and like handing

6    them a brochure, or, you know, something like that.  And there's

7    no -- there's no sales, there's no close effort or anything like

8    that.

9    Q.    You also mentioned doing a demo of a product is what you

10   call promotional work.  Correct?

11   A.    Yeah, like a -- yes.

12   Q.    And you'd agree that the goal of promotional work is to

13   increase sales of a product.  Correct?

14   A.    No, I don't agree with that.

15   Q.    Why not?

16   A.    Because in the promotional world -- in our world,

17   promotional is an educational thing, it's simply meant to

18   educate consumers.  Companies who will hire promotional

19   companies are not necessarily looking to measure sales increase

20   or anything like that.  A lot of times it's simply just to

21   educate consumers.

22   Q.    Okay.  But they wouldn't be spending money to educate

23   consumers unless they hope the consumer would ultimately buy

24   that product.  Correct?

25   A.    No, not necessarily.  Sometimes the retailers want the

1  brands to do that and they coerce them into doing that simply to

2  have a presence in the store.

3  Q.   Okay.

4  A.   I can give you a number of examples where companies are

5  paid to go and do that promotional work with no expectation of

6  an increase in sales and no actual increase in sales because of

7  it.

8  Q.   Okay.  Now, when you say "no actual increase in sales," you

9  just mean that they don't track any increase in sales?

10 A.   No.  I mean there's actually no increase in sales.

11 Q.   All right.  Let's go to the exemption.  Look at Plaintiffs'

12 Exhibit 2.  You testified that you reviewed a number of

13 documents, including some from the Department of Labor.  And

14 Plaintiffs' Exhibit 2 is a copy of "Fact Sheet 17F:  Exemption

15 for Outside Sales Employees."

16 A.   Am I looking in the folder?

17 Q.   Yes.

18 A.   Oh, sorry.  Plaintiffs' Exhibit 2?  Okay.  I have it.

19 Q.   Did you read this document before you made the decision to

20 classify employees?

21 A.   I would imagine that I did.

22 Q.   Now, you testified at some length that there was a document

23 that you received from Oasis that mentioned pharmaceutical reps.

24 Correct?

25 A.   Uh-huh.  Yes.

1   Q.   And you're aware that that document wasn't produced during

2   this litigation?

3   A.   If that's --

4   Q.   You didn't bring a copy of it with you today?

5   A.   I didn't bring anything with me --

6        MR. FALASCO:  We did, Your Honor.  Not to interrupt,

7   but the reality is that document was not found by us as counsel

8   until after the discovery deadline.  We did not want to

9   complicate that issue by presenting it as evidence in this case.

10  But we have it here if the Court would like to look at it.

11       THE COURT:  Unless someone has a motion, I have

12  nothing to say.  You all may proceed.  If someone is moving to

13  do something, then I'll rule.

14       MR. STEADMAN:  Your Honor, I would suggest at the end

15  of my cross if I could have the chance to review the document,

16  because I haven't seen it, to see if I have any questions.

17       THE COURT:  You can review the document.

18       MR. STEADMAN:  I'd hate to take a break right now to

19  review it.

20       THE COURT:  Well, actually, I think that you ought to

21  take -- I don't have any problem if you want to stop now and

22  look at the document, because you may want to question him about

23  it, and you may not.  They're not offering it.  But if you want

24  to offer it -- I mean, I understand why they're not offering it

25  and I understand what's happened here, but if you want to stop

1   and take a look at it, that's okay.

2              MR. STEADMAN:  I would appreciate that, Your Honor.

3              THE COURT:  Why don't we take a break.  And you let us

4   know when you're ready to go.

5              MR. STEADMAN:  Thank you, Your Honor.

6         (Recess from 10:48 a.m. until 10:53 a.m.)

7              THE COURT:  Everyone, be seated.

8         Mr. Steadman, you may proceed.

9              MR. STEADMAN:  Thank you, Your Honor.

10  BY MR. STEADMAN:

11  Q.   Mr. Tanner, I handed you what I've pre-marked as

12  Plaintiffs' Exhibit 6.  Do you have that in front of you?

13  A.   I do.

14  Q.   And is this the document that you're referring to?

15  A.   Yes.

16  Q.   This is the document you received from Oasis?

17  A.   I believe it is.

18  Q.   Did you read the entire document?

19  A.   Just now or then?

20  Q.   Then.

21  A.   I'm sure I read it multiple times.

22  Q.   Did you understand that the document was describing

23  revisions to the Fair Labor Standards Act regulations that were

24  put in place in 2004?

25  A.   I would assume that I understood that.

1  Q.   And the very last page of the "Outside Sales Exemption," is

2  this the page that you were talking about that mentions

3  pharmaceutical reps?

4  A.   Yeah.  I believe it would have to be, yes.

5  Q.   Okay.  What's your understanding -- what's your

6  understanding of who put this document together?

7  A.   My understanding is that this came from Oasis, which is the

8  company that, you know, provides us all of our advice and

9  compliance information.

10  Q.   Who owns Oasis?

11  A.   I have no idea.

12  Q.   You don't own Oasis?

13  A.   I do not own Oasis.

14  Q.   If you look in the top right-hand corner, the "New Standard

15  Duties Test" --

16  A.   Yes.

17  Q.   -- it says, "Making sales or obtaining orders or contracts

18  for services or for the use of facilities for which a

19  consideration will be paid by the client or customer."

20       Did ActionLink's brand advocates take money?

21  A.   No.

22  Q.   Did ActionLink's brand advocates ever have -- excuse me.

23  Did ActionLink's brand advocates ever have title to a television

24  that they transferred to a customer?

25  A.   No.

1  Q.   If you'll go back to Plaintiffs' Exhibit No. 2, the DOL

2  fact sheet.  Do you believe you looked at this fact sheet when

3  you were making the decision to classify brand advocates as

4  exempt employees?

5  A.   I would imagine that I did.  I don't have a specific

6  recollection of reading it, but there was a number of documents

7  that we reviewed.

8  Q.   Okay.  Were you aware that promotional work that's

9  incidental to sales made, or to be made, by somebody else is not

10 exempt outside sales work?

11 A.   I was.

12 Q.   And because of that, you had a question in your mind about

13 whether brand advocates could be classified as exempt or

14 nonexempt employees?

15 A.   Yeah, that's part of it.  It created sort of a conflict in

16 my mind that if, you know, this incidental sales thing in my

17 opinion was exactly what a pharmaceutical rep did, so there was

18 an inherent conflict that on one hand an incidental sale can't

19 be considered exempt but yet a pharmaceutical rep can.  So there

20 seems to be a conflict in the advice there.

21 Q.   Okay.  And you can't buy drugs without a -- prescription

22 drugs without a prescription.  Correct?

23 A.   It depends.  Generally, I would say yes.

24 Q.   You can't lawfully buy prescription drugs without a

25 prescription?

1   A.   That is correct.  I knew where you were going.  Yes.

2   Q.   And you testified you talked to some pharmaceutical reps to

3   find out what they did?

4   A.   Yes.

5   Q.   Did you ask the pharmaceutical reps how they were paid?

6   A.   Yes, I did.

7   Q.   What were you told about how pharmaceutical reps were paid?

8   A.   That they were, you know, paid a salary and they got

9   bonuses and that there was -- there was not a -- they didn't get

10  paid specifically for every visit that they made to a doctor or

11  anything like that, that it was a salary-plus-bonus job where

12  they had control over their schedule and routes and stuff like

13  that.

14  Q.   And brand advocates didn't get commissions or incentive

15  pay.  Correct?

16  A.   This program was originally set up to where they were going

17  to get 10 percent commission, you know, performance commission.

18  So this program was actually intended to have a 10 percent

19  commission component to it.

20  Q.   Did any brand advocates ever receive any incentive pay?

21  A.   No.

22  Q.   When was the 10 percent commission scrapped?

23  A.   As soon as LG told us, after we signed the contract, that

24  they were revoking it.

25  Q.   So in the very early stages the incentive pay was revoked?

1    A.    Yes.

2    Q.    Did you understand there were a lot of lawsuits about

3    whether pharmaceutical reps could be classified as exempt

4    outside sales employees?

5    A.    When we were making this decision, I don't think we were

6    aware that there was a lot of lawsuits about that particular

7    issue.  We became aware of them, obviously, when we started

8    getting lawsuits about the issue, of course.

9    Q.    So your research in determining whether to make these

10   employees exempt employees, you got this document that talks

11   about pharmaceutical sales reps, but you didn't do any further

12   investigation to find out whether that was in fact correct?

13   A.    Whether or not they --

14   Q.    Whether or not pharmaceutical -- whether or not it was

15   universally accepted that pharmaceutical sales reps could be

16   considered outside sales employees.

17   A.    No.  This came from what we considered a definitive source

18   on all of our HR, legal, and compliance matters.  So, no, I

19   didn't.

20   Q.    Does ActionLink -- at this time did ActionLink have a

21   corporate attorney that provided it legal advice?

22   A.    On HR matters?

23   Q.    On any matters.

24   A.    I mean, we have various attorneys that we use for different

25   things, but we did not have, you know, like a designated

1  corporate counsel that we go to.  For most issues that relate to

2  this kind of stuff, we relied on Oasis because Oasis had their

3  own in-house counsel that they made available to us, and then

4  they also had outside counsel when the issue escalated to a

5  point where they felt outside counsel was needed and they would

6  refer us to them.

7  Q.   And Oasis's in-house counsel didn't attend these roundtable

8  meetings?

9  A.   No.

10  Q.   Did you have any conversations with Oasis's in-house

11  counsel about this classification decision?

12  A.   I did not.

13  Q.   Earlier you testified that industry practice is clear in

14  that the people who do the type of work as brand advocates are

15  universally classified as exempt.  Is that your testimony?

16  A.   In our industry, full-time brand advocates outside of our

17  company are universally classified as exempt, yes.

18  Q.   And you earlier mentioned an issue, the bigger issue being

19  1099s.  Do you also consider a 1099 person to be an exempt

20  employee?

21  A.   Well, no, no.  And we don't have any 1099 people in our

22  company.

23  Q.   And maybe I misheard your earlier testimony, but did you

24  mention that the 1099 issue was a big issue in the industry?

25  A.   So, yes.  The issue of whether or not it's legal or

1   acceptable to employ reps in our industry as 1099 contractors as

2   opposed to W-2 employees is a hotly debated topic in our

3   industry, with some companies choosing to engage reps as 1099

4   contractors and other companies exclusively only hiring people

5   under a W-2 type of arrangement.  And we've obviously chosen to

6   not go near the 1099 issue.

7   Q.   Do most of the other companies in the industry use 1099

8   employees?

9   A.   I wouldn't say most.  I would say there's some that do, but

10  there's probably just as many that don't.

11  Q.   And then based on this Court's ruling and the Eighth

12  Circuit ruling, you understand that the industry practice is

13  wrong?

14  A.   I do.

15  Q.   But back when you made this decision in late 2010, that was

16  common industry practice.  Correct?

17  A.   Yes, it was.

18  Q.   You testified that the brand advocate position was similar

19  to the field representatives that ActionLink employs for a

20  variety of different contractors.  Correct?

21  A.   No, not necessarily.  I'm not sure exactly what you're

22  trying to ask.  But every position that we have is pretty

23  specific and unique.  So I mentioned earlier that we have three

24  or four thousand reps, but we might have 65 different job

25  descriptions for those different reps because they have very

1    different positions.  So not all of our reps fit the same job

2    duties and responsibilities as the brand advocates on the LG

3    program.

4    Q.    Going back to 2010, did ActionLink -- at the time this LG

5    program was put into place, did ActionLink have other full-time

6    field representatives?

7    A.    At that time or had we at all in the past?

8    Q.    Either at that time or in the past.

9    A.    I don't recall if we had any at that time, but we -- these

10   programs come and go and start and stop, and so we definitely

11   have and -- yeah.

12   Q.    On these other programs, how did you pay the employees,

13   salary or hourly?

14   A.    For a full-time dedicated brand advocate, we paid them as

15   salary exempt.

16   Q.    So that's consistent with industry practice and

17   ActionLink's practice.  Correct?

18   A.    Correct.

19   Q.    Then why did you need to have the roundtable if the

20   practice was clear and ActionLink's past practice was clear?

21   A.    That was one of the first questions that I asked, why is

22   this even in question.

23              MR. STEADMAN:  Your Honor, I have no further

24   questions.

25              THE COURT:  All right.  Did we receive Exhibit 6?  We

1    did not?  I was thinking, are you offering Exhibit 6?

2              MR. STEADMAN:  Yes, Your Honor.  I'd like to move the

3    introduction of Exhibit 6.

4              THE COURT:  Plaintiffs' Exhibit 6 --

5              MR. FALASCO:  No objections, Your Honor.

6              THE COURT:  -- will be received without objection.

7         (Plaintiffs' Exhibit 6 received in evidence.)

8              MR. STEADMAN:  Thank you, Your Honor.

9              THE COURT:  All right.  You may redirect.

10             MR. FALASCO:  Thank you, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. FALASCO:

13   Q.   Mr. Tanner, do you rely on Oasis for their professional

14   opinions?

15   A.   Yes, we do.

16   Q.   You were asked about whether or not any LG, or any of the

17   brand advocates take title to a television before it's sold.

18   A.   Yes, I was asked that question.

19   Q.   Do pharmacy reps take title to drugs before they're sold,

20   to your knowledge?

21   A.   I know they have samples, but I don't know if that

22   qualifies as taking title.  So I'm not sure.

23   Q.   Would the samples they give be considered sales?

24   A.   I don't think so.

25   Q.   Okay.  You were asked whether brand advocates accept money

1   for a sale of an LG product.  Do you remember that?

2   A.    Yes, I do remember that.

3   Q.    And you said, no, they don't accept the money.  Right?

4   A.    That's correct.

5   Q.    Do pharmaceutical reps accept money for the sale of drugs?

6   A.    No, they do not.

7   Q.    Now, you were also asked whether or not televisions could

8   be purchased without a prescription.

9   A.    Yes, I was.

10  Q.    And certainly prescription drugs have to have a

11  prescription.  Right?

12  A.    Yes, they do.

13  Q.    Do pharmacies write those prescriptions, or -- excuse me --

14  pharmaceutical representatives write those prescriptions?

15  A.    No, they do not.

16  Q.    In your mind, who ultimately makes a sale from a

17  pharmaceutical rep?

18  A.    In my opinion, it's the pharmacy.

19  Q.    And it goes from the pharmacy rep to the doctor, the doctor

20  to the pharmacy?

21  A.    Doctor to the patient, patient to the pharmacy.

22  Q.    There are several steps there.  Right?

23  A.    Yes.

24  Q.    How many steps are there between a brand advocate and an

25  ultimate sale?

1   A.     In many cases, it's direct.  The only time that it wouldn't

2   be is when -- we don't typically have register access to ring a

3   sale when we're interacting with a customer.  So once we make a

4   sale and a customer says they want something, we walk them over

5   to an employee who can then ring them up and swipe their card.

6   Q.     In your mind, who makes more direct sales to customers,

7   pharmaceutical reps or brand advocates?

8   A.     Brand advocates.

9            MR. FALASCO:  No further questions, Your Honor.

10           MR. STEADMAN:  No questions.

11           THE COURT:  Tell me, who do you remember being at this

12  roundtable discussion that's been referenced here at which

13  either there or shortly thereafter the ultimate decision was

14  made on the classification?  Who all was present, as you recall?

15           THE WITNESS:  By name or title?

16           THE COURT:  Title.

17           THE WITNESS:  Keith Allen, who was our vice president

18  of operations, was in the meeting; Shirley Berry, who would have

19  been director of HR, was in the meeting; Dave Gries was in the

20  meeting; Laura Reed, who also worked in HR, was in the meeting.

21  Beyond that, there's some people that probably were in the

22  meeting, but I don't know for sure whether or not they were.

23           THE COURT:  Was anyone from Oasis in the meeting?

24           THE WITNESS:  No.

25           THE COURT:  Did you get any kind of written opinion or

1    recommendation from Oasis on this issue?

2         THE WITNESS:  I did not see any written recommendation

3    from Oasis, you know, pro or con.  The only thing that I saw

4    from Oasis was the guidelines document that they provided us.

5         THE COURT:  Well, you testified just a minute ago that

6    you relied on Oasis for professional advice.  Did Oasis give

7    ActionLink professional advice in connection with the decision

8    of how to classify the brand advocates?

9         THE WITNESS:  I don't think they rendered like an

10   opinion, which I think would be deemed --

11        THE COURT:  Did you or someone under your supervision,

12   someone who worked for the company, did they call or write Oasis

13   and say:  We've got this new program, the LG Slingshot Program.

14   We're going to be hiring brand advocates.  Here's the job

15   description.  Are they going to be exempt or nonexempt?

16        THE WITNESS:  At that time I don't think we did that.

17   We definitely have and do since then.  But I can't say whether

18   or not that conversation or those kinds of, you know, formal

19   advice was given from them at the time.

20        THE COURT:  So as far as you know, in connection with

21   the decision that we're concerned with today, there was not any

22   professional advice from Oasis?

23        THE WITNESS:  Other than the guidelines, no.

24        THE COURT:  Okay.

25        THE WITNESS:  Which I don't know if these guidelines

1  were put together specifically in response to our question about

2  exemption status or if this was just a standard document that

3  they handed out to their customers all the time.  I don't know

4  if it was unique to us.

5        THE COURT:  You all can follow up.  I wasn't clear in

6  my mind about that.  So any follow-up questions?

7        MR. FALASCO:  Not from me, Your Honor.

8        MR. STEADMAN:  None, Your Honor.

9        THE COURT:  You can step down, Mr. Tanner.  Thank you.

10     Mr. Falasco?

11        MR. FALASCO:  Your Honor, the defense rests.

12        THE COURT:  That means the plaintiff can call

13  witnesses.

14        MR. STEADMAN:  Plaintiffs don't have any witnesses.  I

15  think we've covered all the ground on cross.

16        THE COURT:  All right.  I kind of suspected that, but

17  I wanted to give you your option to do that.

18     You all are both standing.  I'll tell you what I think

19  would be helpful as opposed to closing arguments.  I think if we

20  could have some short briefs that would include what you think

21  the facts are that you've established.  In other words, you'd

22  have a section that would be your proposed findings of fact,

23  even if it's not necessarily labeled that way, and give you a

24  chance to see what kind of case law there is that might be on

25  point.  And I'm thinking maybe no later than a week from today.

1    Would that give you enough time to submit simultaneous briefs?

2         MR. STEADMAN:  That's fine, Your Honor.

3         MR. FALASCO:  Yes, Your Honor.

4         THE COURT:  All right.  I don't want to cut you off

5    from arguing, but I actually would prefer to have briefs with

6    case law.  And you may have case law, but I would prefer to do

7    it that way in this case, and I'd like to do it sooner rather

8    than later.  What we'll do is, we'll make the briefs due

9    simultaneously by 5:00 p.m. a week from today, which would be

10   June 8.  Okay?

11        MR. FALASCO:  Your Honor, for purposes of preservation

12   of the record, could we have the Court's permission that that

13   will be considered our motion for judgment as a matter of law in

14   connection with this trial?

15        THE COURT:  Well, certainly.  If you want to make a

16   motion now, you may.  I mean, I don't want to -- as you know, I

17   used to do a lot of appeals.  I always get very anxious about

18   making sure that parties have adequately protected their record.

19   I'm not sure that a motion for judgment as a matter of law on

20   this issue in a bench trial is necessary to preserve your

21   record, but if you want to make one, you can, or you can include

22   it in your brief.

23        MR. FALASCO:  If I could include it in my brief and

24   the Court agrees, that would suffice.

25        THE COURT:  That's fine with me.

1      You can do the same thing, Mr. Steadman.  That will

2  preserve your record too.

3          MR. STEADMAN:  Thank you, Your Honor.

4          THE COURT:  I don't anticipate wanting responses or

5  reply briefs, but if I change my mind after I've read it, I'll

6  send you a letter and let you know that I think we need an issue

7  addressed further or something.  But I don't anticipate that.  I

8  think if we can get joint briefs, or, rather, not joint briefs,

9  but simultaneously filed briefs a week from today, I think we

10  can get this out fairly soon.

11      Anything else?

12          MR. FALASCO:  No, Your Honor.

13          MR. STEADMAN:  No, Your Honor.

14          THE COURT:  It was very efficiently done.  You've not

15  only been very efficient and quick but cordial and civil in

16  working this out, and I appreciate it, and I wanted to

17  compliment you.  For those of you who have senior partners, you

18  can get this part of the transcript and take it back to them.  I

19  did have one law firm once that I complimented at the conclusion

20  of the hearing and they went and posted it on their website.  I

21  ask you, don't do that.  Don't do that.  But you certainly can

22  go back and tell them Judge Holmes is bragging on you, on both

23  sides.

24      We're adjourned.

25      (Whereupon, the trial adjourned at 11:14 a.m.)

1              C E R T I F I C A T E

2       I, Eugenie M. Power, Official Court Reporter, do hereby

3  certify that the foregoing is a true and correct transcript of

4  proceedings in the above-entitled case.

5

6  /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  June 2, 2016
   United States Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25